JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ADAM EHRLICH

**(b)** County of Residence of First Listed Plaintiff __Philadelphia__
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Daniel A. Pallen, Esq. Law Offices of Daniel A. Pallen PLLC - 114 W. FRONT ST, MEDIA PA   (484) 550-7542

## DEFENDANTS

THE PHILADELPHIA INQUIRER LLC

County of Residence of First Listed Defendant __Delaware Corporation__
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC 1983

Brief description of cause:
Stigma Plus claim + state law defamation claim

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
not stated in complaint

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE   MIA ROBERTS PEREZ

DOCKET NUMBER 2:25-cv-4366

DATE
08/12/2025

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: _Philadelphia Pennsylvania_

---

***RELATED CASE IF ANY:*** Case Number: _2:25-cv-04366_      Judge: _MIA ROBERTS PEREZ_

1. Does this case involve property included in an earlier numbered suit?                                                                    Yes [x]

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?                         Yes [x]

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?      Yes [ ]

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?                                                                                                                                                                 Yes [ ]

5. Is this case related to an earlier numbered suit even though none of the above categories apply?
   If yes, attach an explanation.                                                                                                                                     Yes [ ]

I certify that, to the best of my knowledge and belief, the within case [x] **is** / [ ] **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

*A. Federal Question Cases:*

- [ ] 1. Indemnity Contract, Marine Contract, and All Other Contracts
- [ ] 2. FELA
- [ ] 3. Jones Act-Personal Injury
- [ ] 4. Antitrust
- [ ] 5. Wage and Hour Class Action/Collective Action
- [ ] 6. Patent
- [ ] 7. Copyright/Trademark
- [ ] 8. Employment
- [ ] 9. Labor-Management Relations
- [x] 10. Civil Rights
- [ ] 11. Habeas Corpus
- [ ] 12. Securities Cases
- [ ] 13. Social Security Review Cases
- [ ] 14. Qui Tam Cases
- [ ] 15. Cases Seeking Systemic Relief  *see certification below*
- [x] 16. All Other Federal Question Cases. *(Please specify):* _42 U.S.C. Sec. 1983_

*B. Diversity Jurisdiction Cases:*

- [ ] 1. Insurance Contract and Other Contracts
- [ ] 2. Airplane Personal Injury
- [ ] 3. Assault, Defamation
- [ ] 4. Marine Personal Injury
- [ ] 5. Motor Vehicle Personal Injury
- [ ] 6. Other Personal Injury *(Please specify):*____
- [ ] 7. Products Liability
- [ ] 8. All Other Diversity Cases: *(Please specify)*____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case [ ] **does** / [x] **does not** have implications beyond the parties before the court and [ ] **does** / [x] **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

[X]  Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

[  ]  None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| ADAM EHRLICH | : | CIVIL ACTION |
| v. | : | |
| THE PHILADELPHIA INQUIRER LLC | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.    (x)

| | | |
|---|---|---|
| 08/12/2025 | Daniel A. Pallen | Plaintiff - Adam Ehrlich |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (484) 550-7542 | (484) 550-7532 | dpallen@pallenlaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02


American LegalNet, Inc.
www.FormsWorkFlow.com

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ADAM EHRLICH, | : | |
| GOOD BET TRADING LLC , | : | CIVIL ACTION |
| A KENSINGTON JOINT LLC | : | |
| | : | |
| v. | : | No. _____ |
| | : | |
| THE PHILADELPHIA INQUIRER, LLC, | : | |
| SAMANTHA MELAMED, | : | |
| MAX MARIN, | : | |
| DYLAN PURCELL, | : | |
| MICHELLE MYERS, | : | |
| ANTON KLUSENER, | : | |
| DREW ALDINGER, | : | |
| THE CITY OF PHILADELPHIA, *and* | : | |
| JOHN AND JANE DOES [1-100] | : | |

## <u>COMPLAINT</u>

## I.    INTRODUCTION.

Plaintiffs, Adam Ehrlich, Good Bet Trading LLC, and A Kensington Joint LLC, bring this Complaint for libel against the Philadelphia Inquirer its authors, illustrators, and content producers for producing and publishing a defamatory Article on August 12, 2024. This action is timely; being brought within one (1) year of the publication.[1]   The Article contained numerous false and defamatory statements regarding Plaintiff Adam Ehrlich and his business activities, portraying him as a predatory actor, linked to crime, who is responsible for community blight and displacement. Thereafter, the City of Philadelphia, in both administrative appeals and enforcement litigations, has seized upon the defamatory statements and used those statements to violate the Plaintiffs' due process rights, his right to equal protection under the law, and to cause Plaintiff both pecuniary and

---

[1] The statute of limitations for defamation claims is one year from the date of publication. 42 Pa. C.S. § 5523(1); <u>Cole v. Ferranti</u>, No. 12-2961, 532 Fed. Appx. 205, 2013 U.S. App. LEXIS 17794, 2013 WL4505449 (3d Cir. Aug. 21, 2013). The statute begins to run from the time of publication. Wolk v. Olson, 730F. Supp. 2d 376, 377 (E.D. Pa. 2010). Defendant, The Philadelphia Inquirer published the Article in question on August 12, 2024.

reputational harm.  Plaintiff is entitled to compensatory damages and seeks that this court declare that the City's actions have violated Plaintiff's constitutional rights.  Plaintiff also seeks that the City be enjoined from relying on the defamatory Article in present and future appeals, proceedings and litigations against Ehrlich or his associated business entities.

## II.    PARTIES.

1.    Plaintiff Adam Ehrlich is an adult individual residing at 863 N. 25th Street, Philadelphia PA 19130, and who is a principal of multiple LLCs engaged in the purchase and management of real estate within the City of Philadelphia.  Two of those LLCs include Good Bet Trading LLC ("GBT") and A Kensington Joint LLC ("AKJ").

2.    Good Bet Trading LLC is a Pennsylvania Limited Liability Company (Entity No. 4140250) having the address of 1900 John F. Kennedy Blvd., Suite 1003, Philadelphia, PA,  19103 as per the Pennsylvania Department of State.

3.    A Kensington Joint LLC is a Pennsylvania Limited Liability Company (No. 3609682) having the address of  1815 Hart Lane, Philadelphia, PA  19134, as per the Pennsylvania Department of State.

4.    Defendant, The Philadelphia Inquirer, LLC (Pennsylvania Entity No. 3968503) (the "Inquirer") is a Delaware limited liability company which publishes the "Philadelphia Inquirer" – the largest print newspaper in circulation within the state of Pennsylvania.

5.    Defendant, Samantha Melamed ("Melamed"), is a reporter who self- describes her role as a member of the Philadelphia Inquirer's "Investigations Team, digging into stories about how injustice, corruption, and government dysfunction impact Philadelphians."[2] Upon information

_____

[2] https://www.inquirer.com/author/melamed_samantha/

and belief, Melamed resides within the City of Philadelphia at ████████████ and may be served within the City and County of Philadelphia.

6.      Defendant, Max Marin ("Marin") is an investigative reporter who "works across the newsroom on fast-paced accountability-driven stories."[3] Upon information and belief Marin resides at ████████████ within the City of Philadelphia and may be served within the City and County of Philadelphia.

7.      Defendant, Dylan Purcell ("Purcell"), is a reporter employed by the Philadelphia Inquirer. A finalist in the 2019 Pulitzer Prize in local reporting he is described as "a reporter on the Inquirer's investigative team."[4] Upon information and belief, Purcell resides in Elkins Park and may be served in Montgomery County Pennsylvania.

8.      Defendant, Michelle Myers ("Myers") is a reporter employed by the Philadelphia Inquirer who contributed to the defamatory publication and may be served within the City and County of Philadelphia.

9.      Defendant, Anton Klusener ("Klusener") is a staff illustrator employed by the Philadelphia Inquirer who may be served within the City and County of Philadelphia.

10.     Melamed, Marin, Myers, Purcell and Klusener are each employees of The Philadelphia Inquirer, LLC and each authored or contributed to the authorship of a certain defamatory Article published on August 12, 2024.

11.     Defendant, the City of Philadelphia ("City"), a City of the First Class, in the Commonwealth of Pennsylvania.

---

[3] https://www.inquirer.com/author/marin_max/
[4] https://www.pulitzer.org/finalists/barbara-laker-wendy-ruderman-dylan-purcell-and-jessica-griffin-philadelphiainquirer#:~:text=Dylan%20Purcell%20is%20a%20reporter,investigative%20team%20specializing%20in%20data.

12.     Defendant, Drew Aldinger serves as the Chief Deputy City Solicitor for the Property Assessment, Boards & Commissions Unit within the City of Philadelphia Law Department. In this capacity, he leads the legal representation for several city entities, including the Office of Property Assessment (OPA).

## III.     JURISDICTION AND VENUE.

13.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 42 U.S.C. § 1983, as Plaintiffs assert claims arising under the Constitution and laws of the United States.

14.     This Court has supplemental jurisdiction over Count I pursuant to 28 U.S.C. § 1367, as it is so related to Count II that it forms part of the same case or controversy.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred within the Eastern District of Pennsylvania.

## IV.     FACTS.

16.     Plaintiff Adam Ehrlich ("Ehrlich") is in the business of buying and selling financially distressed properties and vacant land within the City of Philadelphia as a whole including its Kensington neighborhood.

17.     Ehrlich has a deep civic connection with the City of Philadelphia, and its neighborhoods beyond just the Kensington neighborhood.  Ehrlich was honored in year 2016 by Hon. Sheriff Jewell Williams and the Office of the Sheriff City and County of Philadelphia, in recognition for his service and community outreach.

18.     On August 12, 2024, The Philadelphia Inquirer published an Article ("Article") entitled **"How speculators fueled a nightmare for Kensington residents — and could soon cash in,"** authored by Samantha Melamed, Max Marin, and Dylan Purcell. (Exhibit "A").

19.    When the Article is searched online in a search engine, the title is condensed and simply reads: "Kensington real-estate speculators are fueling the drug crisis."

20.    This Article was published and printed for delivery as their Sunday Edition, the most read, subscribed, and delivered edition of the week. The Inquirer even offers paper delivery subscriptions for "Sunday Only" delivery plans.

21.    Beyond publishing this Article on the widest circulation day of the week, this Article was boldly highlighted at the top fold of the FRONT PAGE, as a "Special Report".  Below the Special Report headline, a very large photo of Mr. Ehrlich surrounded by a background of altered images. Due to the size of the front page altered photo featuring Mr. Ehrlich, the image carries over from the front page, over the fold, and into the bottom portion of the front page.

22.    The front page garners the highest readership. It is widely regarded as the entry point for most readers and features breaking and most significant local, national, and international news. Readers consistently cite the front page as essential for staying informed about major events affecting Philadelphia.

23.    On this particular Sunday, the Philadelphia Inquirer staff and management decided that the biggest story, Locally, Nationally, or Internationally, that needed to be told to their substantial subscription base was going to feature Mr. Ehrlich's likeness, followed by multiple mentions of his name (including on the Front Page), and then provide an Article for readers containing questionable, incorrect, unsourced and uncorroborated fictions that Inquire presented as unimpeachable facts.

24.    If a recipient of that Sunday print version did not remove it from the plastic, the one thing the recipient would still see clearly is an identifiable photo of Mr. Ehrlich perfectly placed under the words "fueled drug crisis".  (Exhibit "B").

25.     As a result, anyone who recognized or was familiar with Ehrlich were more prone and incentivized to read the Inquirer's Article more fully and focused, regardless of the veracity of the claims and statements made about and against Ehrlich in the content of the Inquirer's highlighted, front page, special report, Article.

26.     The Article identifies Ehrlich by name as a real-estate speculator maintaining a portfolio of more than 125 properties in Kensington, and close to 800 citywide and ties him to mass property acquisition, setting up a narrative that he is a primary driver of community decline.

27.     It describes Ehrlich as a "professional Sheriff Sale buyer in the 2000s" when in fact, Ehrlich (and/or an associated LLC) made its first purchase in year 2013. Additionally, the Article appears to cites violations on properties and attributed to Mr. Ehrlich for instances prior to the relevant properties having been officially owned by one of his affiliated companies.

28.     In 2020, the "Triple X", a brick building situated at 2837 Kensington Avenue was sold by the owner though a wholesaler and eventually to "A Kensington Joint LLC".  The Inquirer Article describes the property as a fenced- in compound located in Kensington, encompassing two vacant lots and an empty storefront that previously operated as an adult bookstore and alleged prostitution front, marked by a fading "XXX" sign above the door.

29.     The Article at issue, published on August 12, 2024, opens by stating that Plaintiff Adam Ehrlich "bought an empty building," referencing a specific property on Kensington Avenue known colloquially as "Triple X."

30.     Contrary to the Inquirer's assertion that "Ehrlich bought the empty building" known locally as the "Triple X," the property located at 2837 Kensington Avenue was not purchased by Plaintiff individually but rather by a Pennsylvania limited liability company, A Kensington Joint LLC, in which Plaintiff holds a member interest.

31.     At the time of the purchase, the property was not an "empty" or abandoned building; but rather a functioning retail establishment that had been operating continuously in the neighborhood and, by virtue of its longstanding operation, was grandfathered into zoning and any business use exceptions applicable in that corridor. Furthermore, given the special nature of licenses, permits grandfathered to the Property, it had additional rights and privileges first established back in the early 1900's with the City of Philadelphia..

32.     The Article falsely characterizes the property as a "prostitution front" without any historical clarification or attribution, and fails to distinguish between past allegations and the condition or use of the property at the time of Plaintiff's investment.  It fails to clarify that any alleged and unsubstantiated prostitution activity was historical and predated the purchase.[5] To the contrary, the Article implies to the average reader that Ehrlich was somehow connected to or complicit in such activity.

33.     The omission here invites the defamatory inference that Plaintiff, individually, knowingly purchased or operated a property that was an active front for prostitution, a claim that is categorically false and imputed to Ehrlich without evidence or clarification.

34.     In general, the Article creates a misleading narrative that falsely suggests Ehrlich played a role in causing or exacerbating the ongoing public health and safety issues, when in fact those conditions were entrenched long before his investment activity began. Further the Article implies a direct connection between Plaintiff and criminality.

35.     When Ehrlich began purchasing vacant land and distressed properties at Philadelphia tax sales the opioid drug crisis had already taken root and gained state-wide and

---

[5] The Article includes a photo of a year 1997 community protest.

national attention. The drug epidemic and the opioid epidemic in Kensington predate Adam Ehrlich's involvement in the area.

36.     The Article drives the narrative of community decline, singling Ehrlich out and stating: "[a]bsentee landlords and real estate speculators such as Ehrlich have fueled Kensington's degradation for decades." The implication is that Ehrlich is personally responsible for long-term neighborhood blight and that he was an absentee to the Kensington neighborhood.

37.     Within two (2) years of the purchase of the vacant land and vacant building in 2020, the Triple X property, per the Inquirer Article was overrun by drug activity. That activity, however, is both endemic and ubiquitous throughout Kensington.[6]  No distinction was made in the Article between the building known as the Triple X, and the surrounding streets and vacant lots, in which alleged drug activities occurred.

38.     The Article describes the existence of an "open-air drug market" and attributes the neighborhood's current struggles to that worsening drug crisis "Dealers set up tables in the lots outside, as if for a farmer's market, to sell illicit narcotics. They even pitched tents... to get high in private." (Exhibit "A").  None of these "open-air" setups were contained inside the building known as 2837 Kensington Ave.

39.     The Article describes the Triple X property as "Ground Zero" of that drug crisis in Kensington, *despite also quoting residents who:* attribute chronic drug activity to multiple unrelated properties on the same block of Hart Lane.

---

[6] Kensington, a neighborhood in North Philadelphia, has become internationally notorious through dozens of YouTube walking tours that depict rampant homelessness, addiction, and open-air drug use—especially near the Kensington and Allegheny ("K & A") corridor. These viral videos have shaped public perception, often portraying the area as a symbol of urban collapse and systemic failure.

40.     In particular, Deborah Dangerfield is quoted stating that "there are four houses… that are drug houses on the block," yet none of those houses are identified as the Triple X, nor is there any indication that they are owned by Plaintiff or A Kensington Joint LLC.

41.     The Article makes no effort to reconcile this internal contradiction or clarify that the properties referenced by Dangerfield are unrelated to Plaintiff. Instead, it misleadingly attributes the epicenter of the drug crisis to the Triple X, thereby falsely suggesting Ehrlich's property is singularly responsible for neighborhood decline.

42.     To the contrary, on video, Police Officers who regularly patrol the immediate area, stated in the summer of 2023 that neither Triple X nor the intersection of Kensington and Hart was a focal point or a ground zero for drug activity in the area.  But rather that drug activity was everywhere and ubiquitous in Kensington.

43.     The direct implication from the Article is that this activity occurred on property owned by Ehrlich and with Ehrlich's approval; establishing a nexus between his ownership and open-air drug sales and, even further implicating Ehrlich criminally in the facilitation of narcotics activity.

44.     The Article states that "three such lots near Triple X on Hart Lane, alongside another lot owned by Ehrlich, have become magnets for drug sales and tent encampments." This phrasing misleadingly suggests both geographic and legal proximity to Plaintiff.

45.     The Article provides no documentation, police reports, arrest records, or other substantiating evidence to support any claim that drug sales occurred on the Triple X property or that any individual was ever arrested or detained for drug activity at or inside that property.

46.     The Article continues: "then, in August 2022, the problems at Triple X escalated: A man ***shot and killed*** a person inside a nearby corner store on Kensington Avenue, then fled into the storefront of the former adult bookstore."

47.     After investigating the matter, it appears to Plaintiff, that the man was alleged of fleeing into the storefront of the Triple X was not sought for or even alleged to be involved with anyone's death.

48.     Additionally, the Plaintiff is unaware and questions whether the unconfirmed suspect was tried or convicted for anything directly connected to the Triple X or, in general, to the day in question.

49.     Upon information and belief, there was no murder.  Yet the Inquirer Article doubles down and states: "the August 2022 incident in which the gunman fled into the former storefront, had made shutting down the complex a City priority." The implication for the reader is that Ehrlich gave safe harbor to a murderer.

50.     There is no public record, investigation, charge, affidavit of probable cause or any known media reporting as to a murder in August 2022.  The reason is because ***there was no murder*** at a corner store from which an induvial fled to the Triple X.

51.     Per information received, an unknown individual had shot at a car that was allegedly running people over.  The driver ran into Triple X uninvited while the building was occupied.  Individuals inside the Triple X with the driver were referred to as hostages by the police.

52.     Notwithstanding the writers state that the alleged August 2022 murder and the alleged involvement of the Triple X therewith had the direct effect of influencing city leaders

decisions and actions and "...had made shutting down the complex a City priority." Despite this claim, the Article did not quote any City Officials.[7]

53.    In July 2023 the City sued Ehrlich personally, and an associated LLC, filing an emergency petition[8] to demolish the Triple X. alleging that it was an unsafe structure and a public nuisance.

54.    "You shut that nuisance down and there is always the next spot" remarked an adjacent neighbor of the Triple X. The Defendant authors next added: "Indeed the next spot may be another Ehrlich property" which implies and predicts future harm from Ehrlich's holdings and suggests an intentional pattern of endangering the community.

55.    Included in the Article is an interactive graphic entitled: **"Goodbet's Footprint of Blight"** which implies that these properties are blighted due to Ehrlich's choice or will; not revealing that much of Kensington has been blighted since at least year 2015 or earlier and that many of the violations predated the purchases.

56.    "Goodbet's footprint of Blight" makes reference to another one of Mr. Ehrlich's companies, Good Bet Trading, LLC (GBT). GBT primarily operates as a real estate marketing company.  GBT does not directly own any of the properties listed on it's property lists or websites. GBT markets properties owned by other individual persons or legal entities. Disparaging GBT for alleged issues pertaining to other legal entities would be akin to making allegations of blight

---

[7] It is believed that employees of the City of Philadelphia did in fact participate in the influencing and shaping of this Article, and that the reason that data, company names, rumors of police activities and murder, and other factually dubious information was shared by representatives of the City of Philadelphia with one or more author or others involved with the publication of this Inquirer Article. The City knowingly provided a false narrative and distorted fact concerning Mr. Ehrlich and his businesses, and the Inquirer failed to properly fact check the dubious information provided by the City to besmirch the reputation of Mr. Ehrlich and his businesses. In turn, the City of Philadelphia would later use its own municipal fiction, get it printed as 'fact' in the Philadelphia Inquirer, and then be able to submit copies of the Article as 'factual' exhibits in the nuisance lawsuits the City has been been filing against the Plaintiff in other legal matters where the City continues to target the Plaintiffs and their related companies.

[8] *City of Philadelphia v. A Kensington Joint LLC*, 230702222 (granting an injunction and demolishing the Triple X).

against a 3rd party Real Estate Agent or Agency by holding them accountable for the condition of the properties they are listing for other Owners. The reputation of Good Bet Trading, LLC has been sullied and damaged by its inclusion in this Article.

57.     The GBT graphic disingenuously shows properties with **zero "0" code violations** in an attempt to make the Ehrlich's causal "footprint" appear larger to the reader.  .

58.     As to the misleading graphic, a reader cannot get clarification that the substantial number of circles used in the Inquirer graphics by looking at the physical print version. Some clarification is available to select premium paid members who can do deeper dives into the information. The graphic depicts many properties without violations as circles (instead of using some other sort of indicator for properties free from violations) and the takeaway by the reader is that each circle represents a property that Good Bet Trading, LLC and or Adam Ehrlich directly own, and that each circle represents one of their alleged problem properties and blight.

59.     The Article asserts that "his properties in Kensington alone have racked up some 500 code violations since 2014." This statement is materially false and misleading.[9]

60.     The properties referenced in that figure were not acquired by entities associated with Plaintiff until years after 2014.

61.     Most were purchased between 2018 and 2023 through sheriff sale or other distressed-asset transfers, meaning the bulk of the cited code violations predated Plaintiff's or any affiliated LLC's ownership.

---

[9] It is unclear how the Inquirer could have obtained such a complete list of the LLCs definitively owned by Mr. Ehrlich and his affiliated companies unless information was, in part, provided by representatives of the City of Philadelphia. While much of the information used in the Inquirer's graphics is available through Public Records, the identities of the owners of legal entities is not as easily obtained through City public records, and the Papers selection of property addresses and LLC names and ownerships suggests data and information was shared with the Inquirer by the City of Philadelphia that would not have otherwise been easy to efficiently and accurately ascertain without an assist from individuals within the City's employment.

62.     The factually inaccurate and misleading graphic created by Defendant PURCELL cited code violations which predated the Plaintiff's or any other affiliated LLC's ownership (i.e. the date of the recording of the deed).

63.     Many of the properties in question were already subject to City enforcement action, exposed to sheriff sale due to tax delinquency or blight, and suffered from years of neglect by prior owners. To attribute those pre-existing violations to Plaintiff is to misrepresent both his role and the condition of the buildings at the time of acquisition.

64.     The phrase "racked up" further implies that Plaintiff caused a continuous and ongoing deterioration, when in fact many of the violations were inherited and promptly addressed or are duplicative in nature.

65.     The Article next includes the following statement: "It's cheaper to ignore violations for trash or weeds," this is attributed to Plaintiff but, fails to include quotation marks or source citation in the Article itself.  Ehrlich questions having made such a statement; the quoted sentence fragment was misrepresented by its context and purposefully left incorrect and/or incomplete or was improperly and inaccurately paraphrased.

66.     The Article later juxtaposes the unquoted statement with actual, direct quotations from Plaintiff and other speakers, such as neighbors and City officials. This selective quoting practice falsely implies that Plaintiff made the statement, and lends it undue credibility by omission of attribution.

67.     Any comment Plaintiff may have made regarding code enforcement or property maintenance was substantially misconstrued by the reporters and not quoted directly—unlike other statements in the Article—because no such comment by Plaintiff was ever made in those terms or with that intent.

68.     The Article includes a policy claim: "plans to target landlords whose properties cause repeated problems are still being developed," without identifying any source for this assertion. No public official is quoted or named, and no public record is cited.

69.     This unattributed policy claim is framed in a manner that implicitly links Ehrlich to such "problem landlords," which is stated within the Article following paragraphs discussing his properties, including the Triple X.

70.     Given the timing, context, and pattern of actions subsequently taken by the City of Philadelphia—including lawsuits, code enforcement, and public statements—it is reasonable to infer that City officials contributed content to the Article, whether on background or anonymously, and did so with the intent to align future enforcement initiatives with the narrative targeting Ehrlich.

71.     In sum, the Article alleges an irony: "cleaning up Kensington could pave the way... leaving the same speculators who enabled the disorder and disrepair poised to cash in." The Article directly contends that Ehrlich has an unethical profiteering motive; that he profits off of community suffering and that he, himself, is the causal agent of the disorder.

72.     In making editorial and defamatory point, the Article quotes a female, only partially identified as "Jaymie" stating: "Both [drug dealers and Ehrlich] were 'cashing in on other people's misery." The publication of this remark equates Ehrlich morally and economically with street-level drug dealers and directly implies moral turpitude.

### <u>COUNT I</u>
**Defamation**
*Plaintiffs v. The Philadelphia Inquirer LLC, Melamed, Marin, Myers, Kluesener and Purcell*

73.     Plaintiffs incorporate by reference the preceding paragraphs one (1) through seventy-two (72) as if set forth herein more fully at length.

74.    "A *prima facie* case for defamation requires a plaintiff to plead the following: (1) the defamatory character of the communication; (2) publication of the communication to a third party; (3) the communication refers to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury." Brown v. Blaine, 833 A.2d 1166, 1173 n. 14 (Pa. Commw. 2003)(citing 42   Pa. C.S.A. § 8343).

75.    Defendants have published false and defamatory statements concerning Plaintiff, Ehrlich. These statements were published to third parties and the public and understood to be of and concerning Plaintiff.

76.    The Article specifically omits that the Triple X property has long had historical drug-related and nuisance status at least since the 1990s.

77.    The statements described in the factual recitation above were made with at least negligence as to their truth or falsity, and others with actual malice; specifically to include the false statement that a murderer ran into a building owned by Ehrlich for refuge. With a modicum of due diligence the Inquirer and Defendant authors could have learned that no charges were filed in the "fleeing murderer" incident.

78.    Plaintiff has suffered reputational and economic harm as a result of the publication.

79.    Many of the statements contained in the Article and pleaded herein constitute defamation *per se* as they impute criminal conduct, dishonesty, and professional misconduct.

80.    Among the most damaging implications in the Article is the suggestion that Plaintiff Ehrlich, as an individual, purchased and operated a property that functioned as a front for prostitution.

81.     The Article's failure to distinguish between the identity of the purchaser, the actual operational status of the property, and the timing of any alleged illicit use, falsely associates Plaintiff with criminal activity and moral turpitude, constituting defamation *per se*.

82.     The Article falsely attributes drug sales and tent encampments to property allegedly "owned by Ehrlich," when in fact the cited lot is owned by a separate legal entity. The publication fails to identify the correct ownership or substantiate the location of the reported activity, imputing criminal conditions to Plaintiff without basis.

83.     The Article fails to offer any documentation of arrests, citations, or enforcement actions taken at the Triple X site itself, thereby defaming Plaintiff by insinuating criminal facilitation without a factual basis or corroboration. Despite citing no arrests nor statistics, the Article states "the boundaries [Ehrlich] set such as barring drug dealers, didn't work".

84.     The Article's claim that "his properties in Kensington alone have racked up some 500 code violations since 2014" falsely attributes the existence and accrual of those violations to Plaintiff, despite the fact that most of the properties entered his portfolio years after 2014 and were already in blighted condition at acquisition.

85.     The statement misleadingly implies that Plaintiff transformed stable or code-compliant buildings into hazardous ones, when in reality he purchased distressed properties that had already been subject to enforcement. The false implication of causation and neglect constitutes defamation *per se*.

86.     The Inquirer falsely attributed to Plaintiff a dismissive attitude toward code enforcement by stating, "It's cheaper to ignore violations for trash or weeds," without placing the remark in quotation marks or identifying a source. This deliberate omission allowed the authors to present their own editorial interpretation as fact, while avoiding accountability for accuracy.

87.    The use of quotation marks elsewhere in the Article—including for much less significant remarks by third parties—underscores the authors' selective and misleading approach. The failure to attribute this particular statement to any source was intended to impute to Plaintiff a reckless disregard for law and community health, which is defamatory and untrue.

88.    The publication's designation of the Triple X property as "Ground Zero" of the neighborhood's drug crisis is unsupported by the statements of its own cited witnesses, who reference numerous other properties as active drug houses without any connection to Plaintiff whatsoever.

89.    The contradiction between the narrative framing and the Article's factual admissions reflects not only negligent reporting but also reckless disregard for truth, with the intent to assign maximal blame to Plaintiff for complex systemic issues unrelated to him or his business entities. The statements are not just negligently made, but rather made recklessly without regard to their veracity.

90.    The publication of Mr. McKinney's statement within the Article, that the Triple X was "the most egregious operation on the Avenue," without context, documentation, or opportunity for rebuttal, was designed to provoke public outrage and criminalize Plaintiff's ownership of a property that had long-standing challenges inherited from prior owners.

91.    The authors double down on McKinney's statements and state: "but in the organized drug market at Triple X one dealer assured her produce was xylazine free".  There is no proof of an organized market.  Drugs were not sold within the Triple X building.

92.    The phrase "organized drug market" recklessly imputes criminal facilitation and managerial responsibility to Plaintiff, when in fact any such activity occurred without his consent or knowledge.

93.     The Article's claim that drug activity occurred "in the organized drug market at Triple X" falsely implies that Plaintiff knowingly permitted or facilitated criminal conduct on the premises. This statement lacks any supporting evidence—no arrests, reports, surveillance data, or physical evidence connects Plaintiff to the alleged activity.

94.     The phrase "organized drug market" conveys to the average reader that Triple X was a base of operations for a structured criminal enterprise—an assertion that is not only false but defamatory *per se*, as it imputes serious criminality to Plaintiff without substantiation.

95.     Later, the Article quotes a woman identified only as "Jaymie," who is reported to have stated that she "saw little to distinguish the dealers from the property owner," and that "both were cashing in on other people's misery." These statements are presented without context, qualification, or any factual substantiation.

96.     The Article omits material facts undermining this quote's implication—namely, that Plaintiff has incurred significant financial liability as a result of owning these properties, including dozens of enforcement proceedings by the City of Philadelphia, many of which carry steep and arbitrary fines, legal expenses, and no indication of profitable return.

97.     Plaintiff and his affiliated companies have been engaged in multiple pending litigations with the City involving emergency petitions, nuisance actions, and tax appeals, and there is no public record or credible evidence that Ehrlich has "cashed in" or derived substantial net income from the Kensington properties.

98.     The Inquirer's selective use of Jaymie's quote, without balancing facts or opposing perspectives, advances a false moral equivalence between Plaintiff and illegal drug dealers and attributes motive and profit where there is none. The entire tone of Article paints Ehrlich as a blight

profiteer, often without attribution or context supporting that this publication was made with actual malice.

99.     The Inquirer's publication of the quote from "Jaymie," equating Plaintiff with narcotics dealers and suggesting he is "cashing in on other people's misery," is not merely an opinion—it is a factual assertion about motive and financial gain, offered without evidentiary support and contradicted by the public record.

100.    Plaintiff has not profited from the properties at issue but has instead incurred ongoing litigation costs, code enforcement penalties, and operational losses. The Article's failure to disclose this reality reflects a deliberate editorial decision to present Plaintiff as a profiteer without allowing readers to understand the financial and legal burdens he actually faces.

### COUNT II
### Violation of Due Process (Stigma-Plus Doctrine) – 42 U.S.C. § 1983
### Plaintiffs v. City of Philadelphia and Drew Aldinger and John/Jane Does

101.    Plaintiffs incorporate by reference the preceding paragraphs one (1) through one hundred (100) as if set forth herein more fully at length.

102.    Since the publication of the Article, the City of Philadelphia, in various ways, has capitalized on the defamatory statements made by the Inquirer and its authors to cause Ehrlich harm

103.    The City of Philadelphia, acting under color of state law, adopted and relied upon false and stigmatizing statements from the August 12, 2024, Article, when said Article was circulated by Defendant, Drew Aldinger.

104.    On December 19, 2024, Aldinger, Chief Deputy Solicitor for the City of Philadelphia, also while acting under color of state law, emailed a copy of the defamatory Inquirer Article to the Board of Revision of Taxes ("BRT"), requesting that it be shared with members of

the adjudicative panel responsible for evaluating tax assessments on properties owned by Plaintiff Adam Ehrlich and his affiliated LLCs. (Exhibit "C").

105.    When disseminating the Inquirer Article *via* email to BRT board members, Defendant Aldinger, copied Ehrlich on the email. Upon receiving the message, Ehrlich immediately objected, replying:

> Please do not include this Article as it is completely irrelevant to the tax assessments in question. There's nothing in that Article which speaks to the property values being discussed at today's hearings. The Article only serves to be inflammatory and irrelevant to these BRT proceedings.

106.    Aldinger's dissemination of the Article—containing stigmatizing and defamatory claims about Ehrlich—was not accompanied by any notice, hearing, or opportunity to respond, and occurred in the context of a quasi-judicial proceeding affecting Plaintiff's property interests.

107.    This unauthorized publication of false and reputation-damaging material by the City and Aldinger individually, while acting under color of state law and in a forum where legal determinations were being made, constitutes a violation of Plaintiff's procedural due process rights under the "stigma-plus" doctrine recognized in Paul v. Davis, 424 U.S. 693 (1976), and its progeny.

108.    Since the dissemination of the Article by Aldinger, nearly 100% of Ehrlich's BRT appeals on behalf of his companies have been denied.

109.    In one such instance of denial (July 2024), and during the public hearing on revision of taxes a board member, with whom Ehrlich had no previous interaction, interrupted Ehrlich's *pro se* advocacy as to a revision/reduction on a particular property, aggressively halted his speech, and stated that the "Board knows all about you Mr. Erhlich."[10]

---

[10] The transcript of this particular hearing is the subject of a Pennsylvania Right to Know Law Request made pursuant to 65 P.S. §§ 67.101–67.3104.

110.    This dissemination of the Article by a public official, Aldinger, constitutes a deprivation of liberty without due process under the Fourteenth Amendment, actionable under 42 U.S.C. § 1983.

111.    Next, in of *Mentor Properties v. City of Philadelphia*[11] the City has made indication to the Court of Common Pleas on May 19, 2025, that it seeks to introduce the Inquirer Article as a trial exhibit for purposes of proving liability and damages against Adam Ehrlich in his individual capacity.

112.    The City has or will file a Complaint in *City of Philadelphia v. Devon Street Properties*.[12]  In the Amended Pleading it weaponizes that false statement: "It's cheaper to ignore violations for trash or weeds," against Ehrlich over a matter concerning a code violation for cars parked on vacant land.

113.    [John and Jane Doe 1-500]. Including various employees, both known and not presently known, have also disseminated this Article in their official capacities in their attempts to discredit or sully Mr. Ehrlich in a variety of different cases, almost as a catch-all argument as to why the City should deny and thwart any efforts made by Mr. Ehrlich to interact with the City of Philadelphia, its Agencies, and its personnel.

114.    While the City may attempt to invoke judicial or litigation privilege, such privilege does not immunize government conduct that weaponizes defamatory material to alter an individual's legal status or rights.

---

[11] August Term, 2024. No. 02505 (Phl. C.C.P).

[12]  February Term, 2025. No. 01334 (Phl. C.C.P).

115.    Under prevailing Third Circuit precedent, including <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225 (3d Cir. 2006), such conduct is actionable where reputational harm is coupled with an alteration of legal rights.

116.    In spring of 2025 the City adopted a policy to which it continues to adhere with respect to code violations:  (a). If a property is in code violation and the LLC is traceable to Adam Ehrlich in any manner; then (b), the City has already (or will continue to in the future advance) a legal theory of veil-piercing in order to obtain liability directly against Ehrlich individually.

<u>**COUNT III**</u>
**Violation of Equal Protection under Law - 42 U.S.C. § 1983**
**Plaintiffs v. City of Philadelphia and Drew Aldinger and John/Jane Does**

117.    Plaintiffs incorporate by reference the preceding paragraphs one (1) through one hundred-sixteen (116) as if set forth herein more fully at length.

118.    Since the dissemination of the defamatory Article by Defendant Aldinger to the Board of Revision of Taxes (BRT), Plaintiff has been subjected to disparate treatment in the adjudication of tax appeals compared to similarly situated property owners who have not been publicly stigmatized.

119.    Nearly 100% of Plaintiff's tax appeals following the Article's dissemination have been denied, in stark contrast to prior years, Plaintiff's historical performance, and in contrast and to outcomes received by *other peer* property owners appealing similar assessments.

120.    In at least one instance, a BRT adjudicator made an unsolicited reference to Plaintiff's reputation, stating during a public hearing that the Board "knows all about you, Mr. Ehrlich," suggesting bias stemming from extrajudicial, defamatory material.

121.    The differential treatment is not based on any lawful criteria related to the underlying properties, but rather stems from reputational stigma and public pressure following the Inquirer's Article and Aldinger's dissemination thereof.

122.    [John and Jane Doe 1-100] including various employees, both known and not presently known, have also disseminated this Article in their official capacities in their attempts to discredit or sully Mr. Ehrlich in a variety of different cases, almost as a catch-all argument as to why the City should deny and thwart any efforts made by Mr. Ehrlich to interact with the City of Philadelphia, its Agencies, and its personnel.

123.    Plaintiff has therefore been denied the equal protection of the laws as guaranteed by the Fourteenth Amendment and 42 U.S.C. § 1983.

[CONTINUED ON NEXT PAGE]

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

(a).    Award compensatory damages in an amount to be determined at trial;

(b).    Award punitive damages against the individual defendants for defamation;

(c).    Declare that the City's actions violated Plaintiff's constitutional rights;

(d).    Enjoin the City of Philadelphia from relying on the defamatory Article, as well as any other article published by the Philadelphia Inquirer in present and future proceedings against Ehrlich and/or any LLCs of which he is an operating member or affiliated;

(e).    Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 or any other applicable fee shifting statute;

(f).    Grant such other relief as the Court deems just and proper to include a retraction of the Article

Respectfully submitted,

**THE LAW OFFICES OF
DANIEL A. PALLEN, P.L.L.C.**

Daniel A. Pallen, Esquire
PA Attorney ID: 207001
114 West Front Street
Media, PA 19063
(484) 550-7542
(484) 550-7532 *fax*

*Attorney for Plaintiffs*

## **VERIFICATION**

    I    hereby    verify    that    the    statements    made    in    the    foregoing

<u>               Complaint               </u>    are true and correct to the best of my

knowledge, information or belief.   The undersigned understands that false statements

herein are made subject to the penalties of 28 U.S.C. § 1746, relating to unsworn

falsification to authorities.

By:   Adam Ehrlich

# EXHIBIT A



# The Philadelphia Inquirer

NEWS

# How speculators fueled a nightmare for Kensington residents — and could soon cash in

Kensington's drug crisis has taken root in properties left vacant and unsecured by speculators. Residents say the city's law-and-order response is lacking without a plan to fix the blight.



Anton Klusener/ Staff illustration. Photos: Jessica Griffin; Elizabeth Robertson; Alejandro A. Alvarez/ Staff photographers/ Getty Images

by Samantha Melamed, Max Marin, and Dylan Purcell

Published Aug. 12, 2024, 5:00 a.m. ET

When Lauren Bruce moved to Hart Lane, in February 2023, she was ready to embrace her new neighborhood. She and her partner shared a vision of starting a community garden on nearby vacant lots.

Instead, the couple found themselves in an all-out Kensington turf war.

For them, the front line was their front steps, where nearly every day they tried to chase off drug dealers hustling bags of fentanyl. The dealers would tell them defiantly, "This is a drug corner" — and a few times tagged the couple's car with graffiti, or smeared it with ketchup and mustard.

But ground zero sat just 100 feet away.

ADVERTISEMENT



Neighbors knew it as "Triple X," a fenced-in compound that encompassed two vacant lots and an empty storefront that once housed an adult bookstore and alleged prostitution front, with a fading "XXX" sign above the door. A real-estate speculator, Adam Ehrlich, had bought the empty building in 2020,

adding it to a portfolio of more than 125 properties in Kensington, and close to 800 citywide.

Dealers set up tables in the lots outside, as if for a farmer's market, to sell illicit narcotics. They even pitched tents that their dozens of daily customers could rent for $5 to get high in private.

"It was the kind of place that could only happen in Kensington," Bruce said.



Kensington resident Lauren Bruce outside her home on Hart Lane near Ruth Street, where one of Adam Ehrlich's buildings, seen in the background, sits vacant.

Alejandro A. Alvarez / Staff Photographer

One day last year, she confronted Ehrlich about the chaos.

His reply, Bruce said, echoed what the drug dealers on the block often told her: Kensington is a rough neighborhood. If they couldn't handle it, they should leave.

ADVERTISEMENT

⌁ ✕

**Partner Content**

INDEPENDENCE BLUE CROSS



**How two Philly organizations are bolstering y mental health in a post-pandemic world**

"It's a rough neighborhood because you're making it that way," Bruce, 40, shot back.

City leaders have sought solutions to Kensington's narcotics crisis either through public health measures or policing. But, as the situation at Triple X demonstrates, stabilizing the neighborhood also will require a reckoning with predatory and negligent real-estate practices. Absentee landlords and real estate speculators such as Ehrlich have fueled Kensington's degradation for decades, often with little intervention from City Hall.

**» READ MORE:** **Police patrols flood Kensington as part of the city's plan to shut down drug markets**

Now, even as residents root for Mayor Cherelle L. Parker to succeed in shutting down the area's notorious drug market, some fear a perverse plot twist: Cleaning up Kensington could pave the way for surging development and soaring property values — leaving the same speculators who enabled the disorder and disrepair poised to cash in.

ADVERTISEMENT

The stretch of Kensington south of Lehigh Avenue has demonstrated how rapidly redevelopment can remake a neighborhood: There, the Fishtown boom has pushed north to Lehigh, where luxury townhomes now fetch more than $500,000.

But upper Kensington — a neighborhood of defunct textile mills and modest rowhouses of roughly one square mile running from Lehigh Avenue north to Tioga Street — has seen fewer major developments. Some ambitious factory-to-loft conversions and self-storage bunkers have been completed. But many developers are deterred by the concentrated gun violence, deep poverty, and high vacancy rate.

**» READ MORE: Chaos and crime followed Kensington encampment clearing**

Even so, upper Kensington has undergone a transformation, but a less visible one: from a neighborhood of homeowners to one increasingly owned by investors. More than half of single-family home buyers there from 2020 to 2022 were corporate entities, buying more than 700 properties, according to Reinvestment Fund data. That's compared with about a quarter of purchases citywide.

ADVERTISEMENT

Bulk buyers such as Ehrlich — just in the last decade — have amassed thousands of rowhouses, vacant lots, storefronts, and warehouses. Corporate owners with at least 20 parcels now hold about one in five properties in upper Kensington, an Inquirer analysis found.

Some of those properties, such as the Triple X, have had outsized impact on their surrounding communities, attracting crime, drug sales, and gun violence.



A February 2023 photo shows one of Adam Ehrlich's vacant lots next to Triple X packed with tents, propane tanks, and trash.

Rock Ministries

On one residential block of Hart Lane, a burned-out rowhouse became a haven for drug sales. Neighbors, who saw people climbing into the charred and collapsing shell, called the police and city Department of Licenses and Inspections (L&I) for years. It was eventually demolished — leaving an overgrown vacant lot that attracted more of the same.

Not far away is a former Catholic church that was once notorious as a shooting gallery — and, three months ago, the site of a horrific death. After what neighbors see as years of neglecting the property, the building's longtime owner recently listed the building for sale, for more than four times what it paid 10 years ago.

ADVERTISEMENT

And then there are the many run-of-the-mill drug houses — places where dealers stash narcotics or conduct sales, or where users can stay the night or stop in to get high — that have tightened dealers' grip on upper Kensington.

**» READ MORE:** Drug deaths and overdoses plague Philly jails, where many are denied drug treatment

Deborah Dangerfield, who lives near Bruce on a block of Hart Lane that's seen 20 shootings since 2019, said such properties enable the violence.

"There are four houses that I can think of that are drug houses on the block," she said. "The owners would abandon these houses and people would just move in."

Clearing the dealers off the corner — or hassling people in addiction by forcing them to move, as the city has done in recent months — won't have lasting impact without problem properties also being addressed, she said.



Philadelphia police patrol Somerset Street near Kensington Avenue in June.

Alejandro A. Alvarez / Staff Photographer

Since 2019, the city has hit more than 1,000 of upper Kensington's roughly 12,500 properties with five or more code violations, sealed more than 800, and cleaned more than 2,500 vacant lots. But city lawyers have taken only about 200 owners in Kensington's 19134 zip code to Common Pleas Court to force them to fix the code violations.

And city properties are part of the problem. More than 200 vacant properties owned by the city or the Philadelphia Land Bank are among Kensington's sources of blight. Three such lots near Triple X on Hart Lane, alongside another lot owned by Ehrlich, have become magnets for drug sales and tent encampments. Neighbors were forced to raise money to fence off the lots last year.

In June, one debris-strewn Land Bank-owned lot on the 3200 block of Hartville Street in June caught fire — forcing neighbors to evacuate. A spokesperson said the Land Bank, whose staff inspects the properties, was unaware of the fire until The Inquirer asked about it in July. Officials are now investigating, the spokesperson said.

**» READ MORE:** The Philadelphia Land Bank is a mess. What is the city's plan to fix it?

Bridget Collins-Greenwald, who heads L&I's new Quality of Life Division, said the agency will step up enforcement in problem corridors across the city that have been identified by City Council members. For the first time, code inspectors will patrol local beats — spotting problem properties rather than waiting for 311 complaints to roll in. The city, on average, is sealing problem properties more quickly, she said — within 10 days, down from 35.

"We believe we're catching a lot of these things before they're even being reported to us," she said.

# Blight and Vacancy Dominate in Upper Kensington

About 900 properties in upper Kensington are sitting vacant or show major signs of neglect, according to an Inquirer analysis of property licenses and 10 years of code violations. On average, a typical block has three or four vacant buildings or lots. Left unsecured, they can contribute to the open-air drug trade.

○ Vacant land   ○ Vacant building



Source: Philadelphia Department of Licenses and Inspections                    Dylan Purcell / Staff

L&I also recently ran a program to educate businesses along Kensington Avenue about code requirements, and teamed up with police on sweeps in Kensington, where workers towed cars, cleaned lots, and sealed abandoned houses.

But plans to target landlords whose properties cause repeated problems are still being developed.

Some residents say that the city needs to hold owners to account, in addition to boarding up properties, which all too often are pried open the next day to become home to a new set of squatters.

"We were just out there!" an exasperated city official told Dangerfield when she called to report another break-in.

## The speculation game

Ehrlich acknowledged buying Triple X with an eye to speculation.

The 48-year-old Center City resident, who does business as Good Bet Trading, has become a familiar, and controversial, presence in Kensington.

A former stock trader and jewelry merchant, he moved into real estate as a professional sheriff sale buyer in the 2000s. He said his strategy is to buy properties no one else wants, hold them until they appreciate, and avoid paying taxes and fees until he's ready to sell. Development, he said, is not for him.



Adam Ehrlich outside City Hall, where he had a court date in July.

Jessica Griffin / Staff Photographer

Properties in Kensington fit the bill: Land is inexpensive. Taxes are low. And he doesn't have a maintenance staff. It's cheaper to ignore violations for trash or weeds, he said — shifting the burden to the city to clean up his properties and send him the bill.

His properties in Kensington alone have racked up some 500 code violations since 2014.

Ehrlich described himself as both an opportunist and philanthropist. He recounted going to McDonald's, buying 50 items on the $1 menu, and handing out McChickens or burgers to people on Kensington Avenue.

He said he took the time to ask people about their lives and tried to help them connect with their families or treatment.

"I've always considered myself a problem solver," he said. "If you have 100 people in a room trying to think of something, I won't guarantee that what I come up with is the best, but there is a very high likelihood that I will come up with something nobody else has come up with."



A 1997 file photograph shows Kensington residents protesting prostitution and other nuisance behavior at the adult bookstore that once inhabited the Triple X building.

Inquirer file photograph

He paid just $66,100 for Triple X building and two adjacent vacant lots. Soon afterward — attracted by the brightly painted mural on one wall and the allure of the building's seedy history — he came up with an unorthodox approach to some of the misery he encountered on Kensington's streets.

"I had these buildings and they're warm and they're dry," he said. "How in good conscience do I not let people who are particularly at risk come in?"

Within months, Ehrlich acknowledged, the complex was overrun by drug activity.

He went to the police, and in August 2022, they sent officers and city workers to clear the lots at Triple X. But by the next day, the drug sales were booming once again.

"This place was a public safety concern for every civic, friends group and resident in the neighborhood," said Bill McKinney, executive director of the New Kensington Community Development Corp. "It was the most egregious operation on the Avenue."

For Jaymie, a neighbor living within eyeshot of Triple X, it was a daily nuisance. She had been homeless in Kensington, clawed her way out of opioid addiction, and stayed in the neighborhood as a renter. By May 2023, she was five years sober. But, she said, Triple X was also a source of temptation. One day, amid a personal crisis, she walked down the street and went inside.

Jaymie, who asked that her last name not be used because she fears being fired from her job over her drug history, was terrified of the xylazine infiltrating the drug supply, which can cause huge open sores. But in the organized drug market at Triple X, one dealer assured her his product was xylazine-free.

So she bought some. Then, she went back — every day, for months.

Jaymie saw little to distinguish the dealers from the property owner. Both, she said, were "cashing in on other people's misery."

## The investor takeover

By the time Ehrlich started buying properties in Kensington about 10 years ago, the former manufacturing hub was in deep decline, its commercial

corridor under the Market-Frankford El a ghost town.

But for those looking to invest in real estate on the cheap, it presented an opportunity.

New York investors were starting to take notice. Some compared the ailing postindustrial neighborhood to parts of Brooklyn in the 1980s — undervalued, close to transit, and primed for gentrification.

Paul Marcus, who runs affordable housing and lending activities for Impact Community Development Corp., a Kensington nonprofit, called it "a gold rush kind of attitude."

"People looked at what was going on in Fishtown and felt, like, 'OK, the natural progression is up north into Kensington.'"

**» READ MORE:** Kensington's international infamy is shaming the city, and shaping policy

Over the last decade, nearly a third of the 68 buildings bigger than 20,000 square feet in upper Kensington changed hands.

That rise in investor purchases is squeezing out some would-be homebuyers. It has also degraded the rental housing stock, said Emily Dowdall, policy director of the Reinvestment Fund, a nonprofit lender in Philadelphia.

In her analysis of investor purchases, the "vast majority" showed no subsequent permits or rental licenses — meaning that the owners aren't rehabbing the buildings, or legally renting them.

"We think in some cases investors realized they can actually raise rents without providing higher-quality housing," she said.

# Investor Purchases Surge in Upper Kensington

From 2020 to 2022, more than half of the 1,342 residential properties sold in Upper Kensington were purchased by institutional investors. They will be poised to cash in if the area turns around.



Source: The Reinvestment Fund

Dylan Purcell / Inquirer Staff

One bulk owner, composed of assorted LLCs linked to two local men, John Ross Jr. and Evan Graham, accounts for 221 properties, more than 1,200 complaints from the public, and 1,500 L&I violations over the last decade.

Many of their rentals are licensed, and among the listings are crisply renovated units. Asked about the hundreds of complaints, Graham said managing Kensington rentals is challenging.

"Case in point, I got a call this morning from somebody that a tenant who was evicted before is squatting in another vacant place of ours. They break in," Graham said. "It's a tough area."

Ross didn't return calls.

Meanwhile, neighborhood leaders have watched with anxiety as portfolios of dozens of single-family homes are marketed for sale, because such portfolios can then be flipped in bulk to out-of-town investors, or bundled into complex financial instruments.

Almost one in five properties in upper Kensington is owned by someone using an out-of-town mailing address, an Inquirer analysis found.

For those investors, $50,000 for a property in Kensington may be pocket change. For neighbors, that same property can become a source of daily agony.



Joan Dansette and her daughter Riley, 14, examine an unkept vacant lot on Hart Lane in Kensington that Dansette said has attracted nuisance activity.

Elizabeth Robertson / Staff Photographer

Joan Dansette said that after Triple X became a drug market, she took long detours to avoid walking past it with her three children.

But there was another nuisance property she couldn't avoid: a vacant, fire-scarred rowhouse across the street from her home.

"People started going in and out, and eventually the whole side of the house started collapsing," she said. With its missing windows, it was easily accessible and attracted drug dealers and users who created mayhem on her residential block.

She contacted the police repeatedly, she said. And her landlord even printed huge "STOP SELLING DRUGS HERE" signs to post around the eyesore.



Joan Dansette posted signs reading "Stop selling drugs here" in hopes of deterring criminal activity near the garden she tends in Kensington.

Elizabeth Robertson / Staff Photographer

Finally, in 2022, the city condemned the property and demolished it.

The owners, Abduvakhov Alimbaev and Hamza Sumrain, sued the city over the demolition. Alimbaev said they had been in the process of stabilizing the building, with plans to renovate and rent it out, when the city razed it and sent them a $20,000 demolition bill.

High weeds there continue to attract trash, Dansette said, and provide cover to stash drugs or weapons.

Alimbaev said he won't rebuild until the area improves.

"Money talks," he said.

# Good Bet's footprint of blight

"Triple X" owner Adam Ehrlich has received at least 500 code violations across 134 properties in upper Kensington, according to an analysis of L&I violations since 2014. That puts him second in the neighborhood for city code violations. Each circle on the map marks one of his properties and is proportional to the number of code violations at the property ranging from zero to 29.



Sources: Phila. Dept. of Licenses and Inspections; Office of Property Assessment

Dylan Purcell / Inquirer Staff

# 'This is happening all over Kensington'

Not long after Ehrlich bought Triple X, he said, a frail woman asked him whether she could sit in a chair, just inside the doorway. He said she'd been beaten up and robbed, so he let her stay.

Soon, others came: a sex worker, who coordinated visits by mobile wound-care vans; an artist, who added to the building's mural; and a woman whom Ehrlich described as a "street healer." One resident, Mary Beth, said Ehrlich helped her work toward getting clean.



One of the residents of Triple X used the wall as an art gallery. Ehrlich said the building should have been protected under the First Amendment based on that artwork.

Courtesy of Adam Ehrlich

"If somebody needed stuff, they knew that if they went to Triple X, there were people who could help in case of emergency," Ehrlich said. "It didn't mean, 'Please bring your drama here.'"

But the drama was inevitable.

The boundaries he set, such as barring drug dealers, didn't work. Mary Beth said many drug users have sold a bag or two at some point to survive.

"Where do you draw the line? If I have some friends who are homeless and really need a safe place, how do we go through and pick?" she said.

As drug dealers took over Triple X, Ehrlich said, he was afraid to confront them, fearing they might be armed.

Neighbors had little sympathy.

"It was totally disgusting and ridiculous," said Ashley Aviles, who felt unsafe going to work at her auto tag shop, Perfect Touch, next door. She said she lost track of all the complaints she made to authorities.

On top of that, Ehrlich dumped chickens there. They frequently escaped, or were found dead, according to six eyewitnesses.

Ehrlich defended the birds as "emotional support animals" for the community.



One of Ehrlich's chickens perches on a chain-link fence. In the background is Tr ... **Read more**

Courtesy of Adam Ehrlich

Then, in August 2022, the problems at Triple X escalated: A man shot and killed a person inside a nearby corner store on Kensington Avenue, then fled into the storefront of the former adult book store.

To Aviles, the chronic chaos next door was infuriating.

"This is happening all over Kensington," she said.



Remains of the altar in the Ascension of Our Lord Church in Kensington are seen in a 2017 file photograph.
David Maialetti / Staff Photographer

# The church of horrors

The century-old Ascension of Our Lord Church — a soaring stone structure once known as the Cathedral of Kensington — looms large over Westmoreland Street. It was one of the largest Catholic parishes in the city, and many neighbors attended its grade school.

But by 2012, its congregation was dwindling, and needed repairs pushed $3 million. In 2014, the archdiocese sold the registered historic building to New Phila Investment LLC, run by an accountant named Kim Ling, for $800,000.

For neighbors, it's been a terror ever since.



The former Ascension of Our Lord Church at the corner of F Street and East Westmoreland Street looms over the two-story rowhouses surrounding it.

Alejandro A. Alvarez / Staff Photographer

In 2017, after an Inquirer column described it as a long-standing shooting gallery, the city and owners both pledged to clean it up.

The property manager George Groves recently said it took 30 Dumpsters to haul out the trash from the chapel. But after the cleanout, New Phila Investments stopped paying him.

"There was a lot of things they could have done with the church," Groves said. "But Mr. Ling didn't want to."

**» READ MORE: From Cathedral of Kensington to heroin shooting gallery**

In 2020, Ling's company tried to cash out. He inked a lease-to-purchase deal with a New York investor worth $1.8 million — a 125% return. But after the

property was vandalized, resulting in $264,000 in damage, the investor backed out. As owner and investor fought it out in court over who was responsible for adequately insuring the property, it once again sat vacant.

"Neighbors are pretty outraged and sad at the state of it," said Shane Claiborne, an evangelical activist and author who lives two blocks away. "I think the owners should be fined every day and every week they let it deteriorate."

The city has issued New Phila Investment more than 90 code violations, and the company has made some repairs. Other violations remain. The city could sue the owners to force them to either fix the violations or pay hundreds of thousands of dollars in fines — but has not done so.

At about nightfall on May 13, police said, a 37-year-old Philadelphia man believed to be high on narcotics entered the shuttered cathedral, and climbed up into the bell tower as officers pursued him.

Police called it a barricade situation — and ended up negotiating with him in the tower for an hour.

Then, to the horror of onlookers, he jumped to his death.



A small memorial on the fence surrounding the former church marks the spot where a man fell to his death during the spring.

Alejandro A. Alvarez / Staff Photographer

The shell of the church and its traumatic events there have cast a long shadow over the block.

"It's like a horror movie in there," said block captain Jeremy Chen, 35, who stewards a nearby community garden. "If a church shut down in other neighborhoods, you would never see it get to this point."



Jeremy Chen (in the yellow hoodie) works with participants in the Klean Kensington program, a community gardening initiative.

Nina Sciacca

Ling, of New Phila Investments, said the building is under contract to be sold.

He heard about the death — but rejected any responsibility.

"Even though it was a very secure building," he said, "anybody can get in."

The woman who plans to buy the full-block complex, a South Philadelphia-based singer named Connie McKendrick, said her plans include a day-care center, community center, and sports facilities.

Neighbors have been impressed seeing her working on the property. But she declined to share detailed plans. City records show that no permits have been issued for the property.

## 'The most triumphant day ever'

As the mayhem at Triple X engulfed their block, Bruce and her partner, Tony Bolante, considered moving away.

But they stuck around, inspired by longtime residents, such as their next-door neighbor, Linda Mottolo, 56, who has lived on Hart Lane since the early 1990s.

Day after day, Mottolo said, she called the police. She reported Ehrlich's properties to L&I, urging the city to take action. She confronted him while he was releasing chickens in a nearby lot. She got her church, the nearby Rock Ministries, to lobby city officials and organize neighbors to shut down Triple X for good.

"I'll never give up on Kensington," Mottolo said. "It's where I live, and I love it here, and I don't like what's going on."

But Triple X's days were numbered. The August 2022 incident in which the gunman fled into the former storefront, had made shutting down the complex a city priority.

The next day, L&I sealed the building — and, according to Ehrlich, trapped a woman inside. The electricity to the building was cut off, he said. And he was hit with a stack of code violations.

He spent months making repairs, he said. But the complex was still a drug hotspot in May 2023, when Jaymie started visiting.

That July, the city sued Ehrlich, filing an emergency petition to demolish what it said was an unsafe structure and a public nuisance.

Bruce went to City Hall with a few other neighbors in September to show support for the planned demolition. She was appalled by Ehrlich's defense — that the Triple X amounted to affordable housing for artists. She works in public health, and her partner, Bolante, is a theater artist.

"Adam could literally create affordable housing for artists," she said. "But he doesn't do that."

In October, the city knocked down Triple X.

To Jaymie, it coincided with a return to sobriety. She stopped using not long after and is now seven months clean.

To Aviles, who runs the business next door, "It was the most triumphant day ever."

"But," she added, "you shut that nuisance down and there's always the next spot. They find another vacant building, another vacant lot. ... It never ends."

Indeed, the next spot may be another Ehrlich property.

He declined to say how many Kensington properties he's allowed people to stay in, but within months of Triple X's demise, a group of people moved into an 11,600-square-foot warehouse he bought last year near McPherson Square.

Neighbor Glory Domenech, 57, said trash and needles have piled up outside. Dealers come and go all day long, and she can smell raw sewage.

"I'm scared for my kids," Domenech said, in Spanish. "I don't want them to see that."

Police and building inspectors visited Ehrlich's property several times, court records show, and one morning in April issued 19 violations.

The city has yet to take him to court.

*Staff writer Michelle Myers contributed to this article.*

ADVERTISEMENT

## ABOUT US

## NEWS & INFO

News

Sports

Entertainment

Business

Health

# EXHIBIT B



# How speculators fueled a drug crisis

Preddato... ...ent property owners have left...ine sites vacant and unsecured, inviting... ...ine to move in. And residents say the city has no plan to fix the blight.

## How shifts in voting could alter Pa.'s results

### We break down trends in this key state into 5 categories. And show how they have changed over the last few elections.

By Aseem Shukla
and Julia Terruso
Staff Writers

The top of the ballot has changed, but the importance for each party of winning Pennsylvania has not. All eyes will be on the critical battleground state in the coming months as Vice President Kamala Harris and former President Donald Trump jockey in a close race. Voting trends in Pennsylvania provide a road map for the kinds of places that will determine who wins this year's presidential election.



# The Philadelphia Inquirer

16, 2021 · VOL 191 NO 36 · ESTABLISHED 1829    CITY & SUBURBS | C | $4.95

**LIFE & CULTURE** D1
**TASTING THE OCEAN:**
**N.J.'S OYSTER SCENE**
**IS EXPERIENCING**
**A RENAISSANCE**

**PHILLY &**
**REGION** B1
**WHERE DID**
**THE DARTS**
**STUDENTS**
**LAND AFTER**
**SCHOOL**
**SHUT DOWN?**

**SPORTS** C1
**WHAT HAPPENED**
**TO BASEBALL'S**
**SUPER TEAMS**

**CAMPAIG**

**How s**
**in vot**
**could**
**alter**
**resul**

We break d
in this key
categorie
they have
the last fe

By Aseem S
and Julia T
Staff Wri

The top
but the
of win
All
battle
mov
Kar
de
re

SPECIAL REPORT: KENSINGTON CROSSROADS

# How speculators
# fueled a drug crisis

Predatory and negligent property owners have left some sites vacant and unsecured,
inviting crime to settle in. And residents say the city has no plan to fix the blight.

Anton Klusener / Staff Illustration /
Photography by The Inquirer
and Getty Images

By Samantha Melamed,
Max Marin, and Dylan Purcell
Staff Writers

themselves in an all-out Kensington turf war.

For them, the front line was their front steps, where nearly every day they tried to chase off drug dealers hustling bags of fentanyl. The dealers would tell them defiantly, "This is a drug corner" — and a few times opened the umbrella to a

adult bookstore and alleged prostitution front, with a fading "XXX" sign above the door. A real-estate speculator, Adam Ehrlich, had bought the empty building in 2020, adding it to a portfolio of more than 125 properties in Kensington, and close to 200 citywide.

Dealers set up tables in the lot

One day last year, she confronted Ehrlich about the chaos.

His reply, Bruce said, was that what the drug dealers did on the block often told her: "K is a rough neighborhood couldn't handle it."

"It's a rough because you're making

# EXHIBIT C

**Subject:** Re: Inquirer Article
**From:** Adam Ehrlich <GoodBetTrading@gmail.com>
**Date:** 12/19/2024, 9:16 AM
**To:** Drew Aldinger <Drew.Aldinger@phila.gov>
**CC:** Carla Pagan <Carla.Pagan@phila.gov>, Adam Ehrlich <brtappeals@gmail.com>, Adam Ehrlich <goodbettrading@gmail.com>
**BCC:** dpallen@pallenlaw.com

Please do not include this article as it is completely irrelevant to the tax assessments in question. There's nothing in that article which speaks to The property values being discussed at today's hearings. The article only serves to be inflammatory and irrelevant to these BRT proceedings.

On Thu, Dec 19, 2024 at 9:13 AM Drew Aldinger <Drew.Aldinger@phila.gov> wrote:
> Carla,
>
> Kindly share the attached article with the BRT.
>
> Thank you,
> Drew