**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ADAM EHRLICH, et al.,** | : |
| | : |
| **Plaintiffs,** | :     **Civil Action No.: 2:25-CV-04620-MRP** |
| | : |
| **v.** | : |
| | : |
| **THE PHILADELPHIA INQUIRER, LLC,** | : |
| **et al.,** | : |
| | : |
| **Defendants.** | : |
| | : |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS OF
DEFENDANTS THE PHILADELPHIA INQUIRER LLC, SAMANTHA MELAMED,
MAX MARIN, MICHELLE MYERS, ANTON KLUSENER, AND DYLAN PURCELL**

October 27, 2025

BALLARD SPAHR LLP

Michael Berry
berrym@ballardspahr.com
Elizabeth Seidlin-Bernstein
seidline@ballardspahr.com
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: 215.665.8500
Facsimile: 215.864.8999

*Counsel for Defendants The Philadelphia Inquirer
LLC, Samantha Melamed, Max Marin, Michelle
Myers, Anton Klusener, and Dylan Purcell*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 2

I.      PLAINTIFFS AND THE TRIPLE X PROPERTY ........................................................ 2

II.     THE ARTICLE AT ISSUE .............................................................................................. 4

III.   THIS LAWSUIT ............................................................................................................... 6

ARGUMENT .............................................................................................................................. 7

I.      PLAINTIFFS ARE COLLATERALLY ESTOPPED FROM DISPUTING
KEY FACTS AND LEGAL CONCLUSIONS FROM THE DEMOLITION
ORDER .............................................................................................................................. 7

II.     PLAINTIFFS' DEFAMATION CLAIM FAILS AS A MATTER OF LAW ................... 9

       A.     The Law Governing Plaintiffs' Defamation Claim ................................................. 9

       B.     The Article Is Not Materially False ...................................................................... 13

       C.     Many of the Challenged Statements Are Constitutionally Protected
               Opinions ............................................................................................................... 23

       D.     Many of the Defamatory Meanings Plaintiffs Allege Are
               Unreasonable ....................................................................................................... 26

III.   THE INQUIRER IS IMMUNE UNDER PENNSYLVANIA'S ANTI-SLAPP
LAW AND ENTITLED TO RECOVER ITS ATTORNEYS' FEES AND
COSTS .............................................................................................................................. 27

CONCLUSION .......................................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Air Wisconsin Airlines Corp. v. Hoeper*,
  571 U.S. 237 (2014)............................................................................................9

*Ali v. McClinton*,
  2017 WL 2588425 (E.D. Pa. June 14, 2017) ......................................................29

*Alston v. PW-Philadelphia Weekly*,
  980 A.2d 215 (Pa. Commw. 2009) .....................................................................23

*Alyeska Pipeline Service Co. v. Wilderness Society*,
  421 U.S. 240 (1975)............................................................................................29

*Ames v. American Radio Relay League, Inc.*,
  716 F. App'x 115 (3d Cir. 2017) ........................................................................10

*Beverly Enterprises, Inc. v. Trump*,
  182 F.3d 183 (3d Cir. 1999)................................................................................12

*Binder v. Triangle Publications, Inc.*,
  275 A.2d 53 (Pa. 1971) ................................................................................13, 19

*Bogash v. Elkins*,
  176 A.2d 677 (Pa. 1962) ..............................................................................12, 26

*In re Brown*,
  951 F.2d 564 (3d Cir. 1991)..................................................................................8

*Bull International, Inc. v. MTD Consumer Group, Inc.*,
  654 F. App'x 80 (3d Cir. 2016) ..........................................................................12

*Bustos v. A&E Television Networks*,
  646 F.3d 762 (10th Cir. 2011) ............................................................................20

*Campbell v. Bank One*,
  79 F. App'x 760 (6th Cir. 2003) .........................................................................16

*Cheng v. Neumann*,
  51 F.4th 438 (1st Cir. 2022)................................................................................10

*City of Philadelphia v. A Kensington Joint, LLC*,
  2025 WL 1649536 (Pa. Commw. June 11, 2025)..............................................4, 9

*Croce v. New York Times Co.*,
  345 F. Supp. 3d 961 (S.D. Ohio 2018) ...............................................................20

*Delaware River Port Authority v. Fraternal Order of Police*,
    290 F.3d 567 (3d Cir. 2002) ................................................................................8

*Dodds v. American Broadcast Co.*,
    145 F.3d 1053 (9th Cir. 1998) ...........................................................................25

*Dunn v. Gannett New York Newspapers, Inc.*,
    833 F.2d 446 (3d Cir. 1987) ..............................................................................24

*First Lehigh Bank v. Cowen*,
    700 A.2d 498 (Pa. Super. 1997) .....................................................................9, 13

*Gagliardi v. Kratzenberg*,
    188 F. App'x 86 (3d Cir. 2006) ........................................................................18

*Green v. Mizner*,
    692 A.2d 169 (Pa. Super. 1997) ......................................................................12

*Harris v. Easton Publishing Co.*,
    483 A.2d 1377 (Pa. Super. 1984) ....................................................................12

*Haynes v. Alfred A. Knopf, Inc.*,
    8 F.3d 1222 (7th Cir. 1993) .............................................................................20

*Hill v. Cosby*,
    665 F. App'x 169 (3d Cir. 2016) ................................................................10, 11

*Hudak v. Times Publishing Co.*,
    534 F. Supp. 2d 546 (W.D. Pa. 2008) .............................................................16

*Jakes v. Youngblood*,
    782 F. Supp. 3d 210 (W.D. Pa. 2025) .............................................................29

*Jankowicz v. Fox News Network, LLC*,
    2025 WL 2630572 (3d Cir. Sept. 12, 2025) ..................................................9, 24

*Kane v. Chester County*,
    811 F. App'x 65 (3d Cir. 2020) ........................................................................24

*Kerrigan v. Otsuka America Pharmaceutical, Inc.*,
    560 F. App'x 162 (3d Cir. 2014) ......................................................................10

*Konarski v. Raycom America, Inc.*,
    2006 Ariz. App. Unpub. LEXIS 505 (Ariz. Ct. App. June 29, 2006) ..................20

*Koniak v. Heritage Newspapers*,
    499 N.W.2d 346 (Mich. Ct. App. 1993) ..........................................................20

*Lavin v. New York News, Inc.*,
757 F.2d 1416 (3d Cir. 1985)....................................................................17

*Lee v. TMZ Productions Inc.*,
710 F. App'x 551 (3d Cir. 2017) .............................................................13

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
838 F.2d 1287 (D.C. Cir. 1988) ...............................................................18

*Marcone v. Penthouse International Magazine for Men*,
754 F.2d 1072 (3d Cir. 1985)....................................................................12

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991)..............................................................................9, 10

*McCafferty v. Newsweek Media Group*,
955 F.3d 352 (3d Cir. 2020)................................................................11, 24

*Merriweather v. Philadelphia Newspapers Inc.*,
61 Pa. D. & C. 4th 423 (Phila. Cnty. C.C.P. 2002)..................................17

*Miami Herald Publishing Co. v. Tornillo*,
418 U.S. 241 (1974)..................................................................................25

*Monge v. University of Pennsylvania*,
2023 WL 2648201 (E.D. Pa. Mar. 24, 2023).........................................24

*Monge v. University of Pennsylvania*,
2023 WL 3571935 (E.D. Pa. May 19, 2023)...........................................13

*Mosley v. Observer Publishing Co.*,
629 A.2d 965 (Pa. Super 1993)..........................................................13, 19

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)..................................................................................11

*Norman v. Greene*,
2025 WL 2555819 (Pa. Super. Sept. 5, 2025) .......................................17

*Oak Grove Cremation Center, Inc. v. Peterson*,
2007 WL 1452235 (Mich. Ct. App. May 17, 2007) ...............................18

*Oaks Gallery & Country Store-Winona, Inc. v. Lee Enterprises, Inc.*,
613 N.W.2d 800 (Minn. Ct. App. 2000)..................................................18

*Pacira BioSciences, Inc. v. American Society of Anesthesiologists, Inc.*,
63 F.4th 240 (3d Cir. 2023) ................................................................11, 25

iv

*Parano v. O'Connor,*
  641 A.2d 607 (Pa. Super. 1994)................................................................................10, 11

*Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.,*
  998 F.2d 1192 (3d Cir. 1993)...........................................................................................4

*Philadelphia Newspapers, Inc. v. Hepps,*
  475 U.S. 767 (1986)..........................................................................................................9

*Saferin v. Malrite Communications Group, Inc.,*
  2000 WL 299454 (Ohio Ct. App. Mar. 24, 2000) .................................................16

*Salaam v. Trump,*
  2025 WL 1789648 (E.D. Pa. June 27, 2025) .........................................................29

*Salaam v. Trump,*
  2025 WL 2375397 (E.D. Pa. Aug. 15, 2025) .........................................................28

*Sands v. McCormick,*
  502 F.3d 263 (3d Cir. 2007)............................................................................................3

*Sarkees v. Warner-West Corp.,*
  37 A.2d 544 (Pa. 1944) ..................................................................................................12

*Schonek v. WJAC, Inc.,*
  258 A.2d 504 (Pa. 1969) ................................................................................................11

*Sciandra v. Lynett,*
  187 A.2d 586 (Pa. 1963) ................................................................................................13

*Shaffer v. Smith,*
  673 A.2d 872 (Pa. 1996) ..................................................................................................8

*Snyder v. Phelps,*
  562 U.S. 443 (2011)........................................................................................................28

*Sunrise Pharmaceutical, Inc. v. Vision Pharma, LLC,*
  799 F. App'x 141 (3d Cir. 2020) .................................................................................10

*SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.,*
  2022 WL 493600 (S.D.N.Y. Feb. 17, 2022)..................................................25, 26

*Tannerite Sports, LLC v. NBCUniversal News Group,*
  864 F.3d 236 (2d Cir. 2017)..........................................................................................10

*Thomas Merton Center v. Rockwell International Corp.,*
  442 A.2d 213 (Pa. 1981) ................................................................................................12

*ToDay's Housing v. Times Shamrock Communications, Inc.*,
    21 A.3d 1209 (Pa. Super. 2011)................................................................................10, 12, 26

*Tucker v. Philadelphia Daily News*,
    848 A.2d 113 (Pa. 2004) ................................................................................................11, 23

*Veno v. Meredith*,
    515 A.2d 571 (Pa. Super. 1986)......................................................................................10, 11

*Youkelsone v. Washington Mutual, Inc.*,
    741 F. App'x 88 (3d Cir. 2018) ..............................................................................................22

**Statutes and Other Authorities**

U.S. Const. amend. I ..............................................................................................................9, 10

Michael Berry & Kaitlin M. Gurney, *Pennsylvania Joins States Enacting Tough
    Anti-SLAPP Protections: The New Uniform Public Expression Protection Act*,
    96 Pa. Bar Ass'n Q. 9-28 (Jan. 2025) ....................................................................................27

Uniform Public Expression Protection Act ("PA-UPEPA"),
    42 Pa.C.S. § 8340.11 *et seq.* ................................................................................27, 28, 29

## PRELIMINARY STATEMENT

This lawsuit arises from an investigative report published by The Philadelphia Inquirer about the role of real estate speculators in contributing to the drug crisis and blight in Kensington (the "Article"). One of the speculators discussed in the Article was Adam Ehrlich, a local man well known for buying hundreds of distressed properties at Philadelphia sheriff sales through a web of companies. Ehrlich-controlled entities own more than 100 properties in Kensington alone. In 2020, an Ehrlich entity purchased the site of a notorious former adult bookstore and adjoining vacant lots, known by locals as "Triple X." The Inquirer Article described events involving Triple X as an example of the issues exacerbated by real estate speculators in Kensington. Soon after Ehrlich's company purchased Triple X, the complex was overrun by drug activity due to his failure to secure it. Eventually, the City intervened and filed an emergency petition with the Philadelphia Court of Common Pleas, which ordered the demolition of the Triple X building for the sake of public safety.

Ehrlich does not dispute much of the Inquirer's reporting. Nevertheless, he and two of his companies claim they were defamed by the Article, pointing to a variety of statements and alleging an array of implications, all of which they say combine to portray Ehrlich as "a primary driver of community decline." Compl. ¶ 26 (Dkt. 17). Their defamation claim is foreclosed under the law for the following reasons:

- Plaintiffs are collaterally estopped from re-litigating the extensive findings of fact and conclusions of law already reached by the Philadelphia Court of Common Pleas in the demolition proceeding;

- That judicial decision, along with public records and Plaintiffs' own admissions, confirm the truth of the Inquirer's reporting;

- Many of the challenged statements are constitutionally protected opinion; and

1

- Many of the defamatory implications Plaintiffs seek to draw from the Article are unreasonable.

The Complaint therefore should be dismissed with prejudice, and Defendants should be deemed immune from suit and entitled to their attorneys' fees under Pennsylvania's new anti-SLAPP statute.

## FACTUAL BACKGROUND

### I.    PLAINTIFFS AND THE TRIPLE X PROPERTY

Plaintiff Adam Ehrlich is an individual "in the business of buying and selling financially distressed properties and vacant land within the City of Philadelphia." Compl. ¶ 16. Through his various limited liability companies, Ehrlich owns hundreds of properties across the city, including over 100 in the Kensington neighborhood. *Id.* ¶¶ 1, 26. Ehrlich does not develop the properties, but rather holds them for eventual sale once they appreciate in value. *Id.* ¶ 16. In the meantime, as he readily acknowledges, his properties have been the subject of "multiple pending litigations with the City involving emergency petitions, nuisance actions, and tax appeals." *Id.* ¶ 97. Ehrlich markets his companies' properties through another company he owns, Plaintiff Good Bet Trading, LLC ("Good Bet"). *Id.* ¶¶ 2, 56.

Ehrlich purchased most of his Kensington properties between 2018 and 2023. *Id.* ¶ 61. By that time, "the opioid drug crisis had already taken root" in the neighborhood. *Id.* ¶¶ 35, 37 & n.6. Those properties also have been the subject of "dozens of enforcement proceedings by the City," which have resulted in "steep" fines. *Id.* ¶ 96. In 2020, one of Ehrlich's companies, Plaintiff A Kensington Joint LLC, paid $66,100 to purchase a brick building at 2837 Kensington Avenue and two adjoining vacant lots, a complex known by locals as "Triple X" for the adult bookstore that once operated there. *Id.* ¶ 28. The property "had historical drug-related and nuisance status at least since the 1990s." *Id.* ¶ 76; Article at 15. After the purchase, Ehrlich

began allowing unhoused individuals to live in the vacant Triple X building.  *Id.* at 15, 23-24.

Ehrlich also dumped live chickens on the property, calling them "emotional support animals."

*Id.* at 24.  Soon, drug dealers set up tables in the empty lots to sell illegal narcotics, as well as

tents for customers to rent while they got high.  Compl. ¶ 38; Article at 4.  Ehrlich was afraid to

confront the drug dealers himself, and, even after police and City workers cleared the lots at

Ehrlich's request, the dealers returned the next day.  *Id.* at 16, 24.  In the summer of 2022, after

an alleged shooting in the area, the suspect fled into the Triple X building for refuge.  Compl.

¶¶ 46-52.  Following that incident, the City's Department of Licenses and Inspections ("L&I")

sealed the building and issued numerous code violations against the property.  Article at 32.

　　　In July 2023, the City filed an emergency petition in the Philadelphia Court of Common

Pleas against Ehrlich and A Kensington Joint, seeking to demolish the Triple X building (the

"Emergency Petition").[1]  Compl. ¶ 53 & n.8; Article at 31; *City of Philadelphia v. A Kensington

Joint LLC*, July Term, 2023, No. 2222 (Philadelphia Cnty. C.C.P.).  In the Emergency Petition,

the City alleged that the building was "a locus of illegal activity," including "drug use" and

"drug sales."  Declaration of Michael Berry ("Berry Decl.") Ex. A (Emergency Petition) ¶ 21.

The City also alleged that the building "was the location of a deadly shooting on August 30,

2022, with the shooter finding refuge within the subject premises, which is open to the public."

*Id.* ¶ 22.

　　　On September 5, 2023, the Philadelphia court issued a 77-page Order and Permanent

Injunction (the "Demolition Order") granting the City's request, making detailed findings of fact

and conclusions of law that agreed with the City's allegations, and holding Ehrlich and his LLC

---

[1] In deciding a motion to dismiss, this Court may take judicial notice of court records from
another proceeding.  *See Sands v. McCormick*, 502 F.3d 263, 268-69 (3d Cir. 2007).

individually and jointly liable for the demolition costs. *See* Berry Decl. Ex. B (Demolition

Order). Ehrlich and A Kensington Joint appealed the Demolition Order, but did not request a

stay of the demolition itself. *City of Philadelphia v. A Kensington Joint, LLC*, 2025 WL

1649536, at *1 (Pa. Commw. June 11, 2025). Within days of the Order, the City completed

demolition of the Triple X building. *Id.* Thus, "only the portion of the [Demolition Order]

holding Ehrlich individually jointly and severally liable for certain costs remains in dispute," and

the legal proceeding to determine the costs owed is continuing in the trial court. *Id.* at *2.

## II.    **THE ARTICLE AT ISSUE**

On August 12, 2024 – nearly a year after the demolition of the Triple X building –

Defendant The Philadelphia Inquirer LLC published an investigative report about the role of real

estate speculators in contributing to the drug crisis and blight in Kensington. Compl. ¶ 29;

Article at 3 (attached as Ex. A to Compl.); *see also* https://www.inquirer.com/news/kensington-

real-estate-speculators-drug-opioid-crisis-gentrification-20240812.html (web version of Article);

Berry Decl. Ex. C (print version of Article).[2] The Article was published online and on the front

page of the newspaper, where it ran under the headline "Special Report: Kensington

Crossroads" and was titled "How speculators fueled a drug crisis: Predatory and negligent

property owners have left some sites vacant and unsecured, inviting crime to settle in. And

residents say the city has no plan to fix the blight." The Article was authored by two Inquirer

reporters, Samantha Melamed and Max Marin, with data analysis and map-based graphics by

Dylan Purcell. Compl. ¶¶ 5-7; Article at 2, 12, 18, 22. Michelle Myers contributed to the

---

[2] A "court may consider an undisputedly authentic document that a defendant attaches as an
exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben.
Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

reporting of the Article, and Anton Klusener created a photo illustration depicting Ehrlich. Compl. ¶¶ 8-9; Article at 2, 33.

As the Article explained, Kensington's problems have been exacerbated by real estate buyers who purchase distressed properties, then do not develop them and instead allow the buildings and lots to sit vacant and in disrepair.  The Article reported that Ehrlich was just one of many "bulk buyers" of properties in the neighborhood, some of which, "such as the Triple X, have had outsized impact on their surrounding communities, attracting crime, drug sales, and gun violence." *Id.* at 7.  The Article told the story of Triple X from the perspectives of its neighbors, civic groups, City officials, and Ehrlich himself, who was quoted extensively.  *Id.* at 3-5, 15-16, 20, 22-25, 31-32.  The online version of the Article included several interactive graphics based on data from public records, including one titled "Good Bet's footprint of blight" that provided a visualization of "at least 500 code violations across 134 properties in upper Kensington" owned by Ehrlich's companies since 2014 (the "Good Bet Graphic"), with circles of different sizes "proportional to the number of code violations at the property ranging from zero to 29."[3]  *Id.* at 22.  By clicking on an individual circle, a reader could see the address, number of code violations, owner, sale date, and sale price for that property.  For example, clicking on the circle for 1807 E. Tusculum Street, which was owned by one of Ehrlich's companies, would bring up the following information:

---

[3] In the print version of the Article, the Good Bet Graphic was not interactive and instead distinguished between properties with violations and those without violations by using orange circles for properties with violations and small white squares for properties with no violations. Berry Decl. Ex. C; *see infra* at 21-22.



**Good Bet's footprint of blight**

"Triple X" owner Adam Ehrlich has received at least 500 code violations across 134 properties in upper Kensington, according to an analysis of L&I violations since 2014. That puts him second in the neighborhood for city code violations. Each circle on the map marks one of his properties and is proportional to the number of code violations at the property ranging from zero to 29.

Sources: Phila. Dept. of Licenses and Inspections; Office of Property Assessment

Dylan Purcell / Inquirer Staff

In addition, the Article discussed other blighted properties not owned by Ehrlich's companies, *id.* at 8-9, 11, 18-19, 20-21, 26-31, situating all of these examples within broader real estate trends in the neighborhood, *id.* at 6-7, 10, 12, 17-19. Finally, the Article described the City's efforts to address these problems, which "could pave the way for surging development and soaring property values – leaving the same speculators who enabled the disorder and disrepair poised to cash in." *Id.* at 4-5, 10-11, 13.

## III.    <u>THIS LAWSUIT</u>

Almost exactly a year after the Article was published, Ehrlich, A Kensington Joint, and Good Bet filed this lawsuit, asserting a defamation claim against the Inquirer and the journalists involved in its reporting (collectively, the "Inquirer") and two civil rights claims against the City of Philadelphia and Chief Deputy City Solicitor Drew Aldinger based on the dissemination of the Article in connection with legal proceedings. Compl. Counts I-III. For their defamation claim,

Plaintiffs challenge more than two dozen statements in the Article and allege numerous defamatory implications,[4] contending the Article portrayed Ehrlich "as a predatory actor, linked to crime, who is responsible for community blight and displacement."  *Id.* at 1.  They seek unspecified compensatory and punitive damages and a retraction of the Article.  *Id.* at 24.

## ARGUMENT

### I.    PLAINTIFFS ARE COLLATERALLY ESTOPPED FROM DISPUTING KEY FACTS AND LEGAL CONCLUSIONS FROM THE DEMOLITION ORDER.

The Demolition Order entered by the Philadelphia County Court of Common Pleas in September 2023 included findings of fact and conclusions of law that are highly relevant to Plaintiffs' defamation claim.  Among other things, the court ruled that:

- Ehrlich created and exercised complete control over A Kensington Joint and Good Bet, Demolition Order at 40, 69;

- Ehrlich has "evidenced a persistent and patterned business practice of buying and holding dilapidated properties, failing to make repairs, allowing them to become unsafe or imminently dangerous properties, and attempting to minimize and not pay the normal carrying costs associated with ownership of those properties by avoiding paying taxes or other municipal liabilities," *id.* at 74;

- Ehrlich permitted unhoused individuals to stay on the Triple X property "despite the existence of deplorable, unsanitary, uninhabitable, and unsafe conditions" there, *id.* at 45;

- Triple X was a site of "open illegal narcotics usage and sales" under Ehrlich's ownership, *id.*, to which he turned "a completely blind eye," *id.* at 73;

---

[4] For the Court's convenience, each of the challenged statements and alleged implications is listed in Exhibit D to the Berry Declaration, along with the grounds on which each fails to state a claim.

- In August 2022, a police SWAT team was called to the Triple X building "due to a shooting that had occurred where an individual had run into the Property," *id.* at 27;

- Ehrlich "actively and passively enabled this exacerbating public nuisance and increased the risk of harm to all concerned from escalating criminal activity," *id.* at 71;

- Ehrlich demonstrated a "pervasive lack of care and concern for how these blatant public nuisances have afflicted the neighborhood," *id.* at 74; and

- Ehrlich should be held personally responsible for the cost of demolishing Triple X, *id.* at 3.

Those rulings have preclusive effect in this case under the doctrine of collateral estoppel. *See Del. River Port Auth. v. Fraternal Ord. of Police*, 290 F.3d 567, 572 (3d Cir. 2002) ("[A] determination by a court of competent jurisdiction on an issue necessary to support its judgment is conclusive in subsequent suits based on a cause of action involving a party or one in privity."); *In re Brown*, 951 F.2d 564, 568-69 (3d Cir. 1991) ("a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered").  Under Pennsylvania law, collateral estoppel applies when "1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action."  *Shaffer v. Smith*, 673 A.2d 872, 874 (Pa. 1996).

Here, each of those elements is met as to the Court of Common Pleas' rulings about Ehrlich's control of A Kensington Joint and Good Bet, the dangerous conditions at Triple X, and

Ehrlich's responsibility for neighborhood blight. All of those issues were necessarily decided in the Demolition Order, which is a final judgment for purposes of collateral estoppel even though the amount of costs owed remains to be adjudicated. As the Pennsylvania Supreme Court has explained, a judgment "is deemed final for purposes of *res judicata* or collateral estoppel unless or until it is reversed on appeal." *Id.* Moreover, Ehrlich and A Kensington Joint have already waived their right to appeal most of the lower court's rulings because they did not request a stay of the Demolition Order before the Triple X building was torn down. *A Kensington Joint, LLC*, 2025 WL 1649536, at *1. Accordingly, Plaintiffs cannot re-litigate the same set of issues in this case. As demonstrated below, the preclusive effect of the Demolition Order is fatal to their defamation claim.

## II.    PLAINTIFFS' DEFAMATION CLAIM FAILS AS A MATTER OF LAW.

### A.    The Law Governing Plaintiffs' Defamation Claim.

Under Pennsylvania law and the First Amendment, a statement can give rise to a claim for defamation only under certain limited circumstances:

***First*, the statement must be materially false.** The First Amendment requires that the plaintiff "bear the burden of showing falsity." *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986). This burden cannot be met merely by pointing to a minor inaccuracy or technical error; the statements must be *materially* false. *Air Wisc. Airlines Corp. v. Hoeper*, 571 U.S. 237, 247 (2014). As the Supreme Court has instructed, the law "overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991); *see Jankowicz v. Fox News Network, LLC*, 2025 WL 2630572, at *3 (3d Cir. Sept. 12, 2025) ("Because only a false statement can be defamatory, a statement cannot be actionable if it is 'substantially true.'"). "Minor inaccuracies do not amount to falsity so long as 'the substance,

the gist, the sting, of the libelous charge be justified.'"  *Masson*, 501 U.S. at 517; *accord ToDay's Hous. v. Times Shamrock Commc'ns, Inc.*, 21 A.3d 1209, 1215 (Pa. Super. 2011).

To meet this constitutional burden at the pleading stage, the complaint must set forth facts plausibly showing that the challenged statements are materially false.  *See Cheng v. Neumann*, 51 F.4th 438, 445 (1st Cir. 2022) ("A complaint cannot plausibly allege falsity where . . . materials incorporated into the complaint refute that very assertion."); *Sunrise Pharm., Inc. v. Vision Pharma, LLC*, 799 F. App'x 141, 142 (3d Cir. 2020) (plaintiff must "plausibly plead that [defendant] made a false statement"); *Ames v. Am. Radio Relay League, Inc.*, 716 F. App'x 115, 120 (3d Cir. 2017) (dismissal of defamation claim is appropriate when "it is apparent on the face of the complaint and related documents that the [challenged] statements . . . are true"); *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) ("a plaintiff must plead facts demonstrating falsity to prevail on a motion to dismiss the complaint in federal court").

***Second*, opinions are protected.**  Under the First Amendment, only statements of verifiable fact are actionable; statements of "subjective interpretation, or opinion," are protected. *Parano v. O'Connor*, 641 A.2d 607, 609 (Pa. Super. 1994); *see also Hill v. Cosby*, 665 F. App'x 169, 174 (3d Cir. 2016) ("a statement must be provable as false to give rise to a claim of defamation") (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990)).  Whether a statement is one of fact or opinion is a threshold question of law for the Court to decide.  *See, e.g.*, *Kerrigan v. Otsuka Am. Pharm., Inc.*, 560 F. App'x 162, 168 (3d Cir. 2014); *Veno v. Meredith*, 515 A.2d 571, 575 (Pa. Super. 1986).  "If a statement could be construed as either fact or opinion," the Court "must construe it as an opinion" because a "contrary presumption would

10

tend to impose a chilling effect on speech." *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 245 n.9 (3d Cir. 2023) (cleaned up).

As the Third Circuit has explained, "opinions based on disclosed facts are absolutely privileged, no matter how derogatory they are." *McCafferty v. Newsweek Media Grp.*, 955 F.3d 352, 357 (3d Cir. 2020) (cleaned up); *see also Hill*, 665 F. App'x at 174 ("Statements that provide the facts on which the opinion-holder bases his or her opinion, known as 'pure' opinions, are not actionable."). The reason for this rule is straightforward: The disclosure of the facts underlying an opinion "allow[s] the recipient to draw his or her own conclusions on the basis of an independent evaluation of the facts." *Id.* at 175-76 (cleaned up). Thus, a "statement in the form of an opinion is actionable only if it may reasonably be understood to imply the existence of *undisclosed* defamatory facts justifying the opinion." *Veno*, 515 A.2d at 575 (cleaned up); *see also Parano*, 641 A.2d at 609 (expressions of opinion "are not actionable unless they imply undisclosed, false and defamatory facts").

***Third***, **a statement must be defamatory.** A statement is defamatory only if it "tends to blacken a person's reputation and exposes him to public hatred, contempt or ridicule." *Tucker v. Phila. Daily News*, 848 A.2d 113, 124 (Pa. 2004). It is not enough for a statement to be embarrassing or annoying to the plaintiff; it must "grievously fracture[] his standing in the community of respectable society." *Id.*

***Fourth***, **the statement must be "of and concerning" the plaintiff.** It is axiomatic that a plaintiff can only state a claim for defamation if the challenged statement is about him. *See Schonek v. WJAC, Inc.*, 258 A.2d 504, 507 (Pa. 1969) ("Defamatory words, in order to be actionable, must refer to some ascertained or ascertainable person, and that person must be the plaintiff."); *accord N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 288-89 (1964). Accordingly, a

defamation claim fails as a matter of law if "the defamatory material" was not "capable of being reasonably understood as intended to refer to the complainant." *Harris v. Easton Publ'g Co.*, 483 A.2d 1377, 1385 (Pa. Super. 1984).

**Fifth, in deciding whether these elements have been met, the challenged publication must be accorded its reasonable meaning.** The law mandates that courts not simply credit the meaning alleged in a plaintiff's complaint. Instead, to determine whether a plaintiff can state a claim, courts must assess whether the challenged publication can "fairly and reasonably be construed to have the meaning imputed." *Bull Int'l, Inc. v. MTD Consumer Grp., Inc.*, 654 F. App'x 80, 105 (3d Cir. 2016) (quoting *Sarkees v. Warner-W. Corp.*, 37 A.2d 544, 546 (Pa. 1944)). Whether the meaning alleged by the plaintiff is reasonable is a question of law for the Court in the first instance. *Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 215-16 (Pa. 1981); *ToDay's Hous.*, 21 A.3d at 1215.

To address that question, a court must consider the challenged statements in their "full context," *Thomas Merton Ctr.*, 442 A.2d at 216, and "consider the effect of the entire" publication, *Green v. Mizner*, 692 A.2d 169, 172 (Pa. Super. 1997). *See also Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1078 (3d Cir. 1985) ("The proper test . . . requires that the allegedly libelous communication be read as a whole, in context."). A claim cannot be based on an "unfair and forced construction." *Bogash v. Elkins*, 176 A.2d 677, 679 (Pa. 1962). Ultimately, if "the words are not susceptible of the meaning ascribed to them by the plaintiff," the plaintiff's claim fails as a matter of law. *Sarkees*, 37 A.2d at 546; *see also, e.g.*, *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 191 (3d Cir. 1999) (affirming dismissal of complaint where statement was "not reasonably susceptible of a defamatory meaning").

12

**Finally**, **the publication cannot be privileged.** Pennsylvania "has long recognized a privilege for the press to publish accounts of official proceedings or reports even when these contain defamatory statements." *First Lehigh Bank v. Cowen*, 700 A.2d 498, 503 (Pa. Super. 1997). This "fair report" privilege is premised on the recognition that "it is in the public interest that information be made available as to what takes place in public affairs." *Sciandra v. Lynett*, 187 A.2d 586, 588 (Pa. 1963). Accordingly, "the truth or falsity of the underlying facts in the article do not affect the privilege so long as the story was a fair and accurate summary of" the government proceeding or report. *Binder v. Triangle Publ'ns, Inc.*, 275 A.2d 53, 57 (Pa. 1971); *see also Mosley v. Observer Publ'g Co.*, 629 A.2d 965, 970 (Pa. Super 1993) (report is privileged even if facts "were eventually shown to be inaccurate"); *First Lehigh Bank*, 700 A.2d at 502 ("A summary of substantial accuracy is all that is required").

A defamation claim arising from a news report that is protected by the privilege fails as a matter of law. *See, e.g.*, *Lee v. TMZ Prods. Inc.*, 710 F. App'x 551, 557-59 (3d Cir. 2017) (affirming dismissal of defamation claims based on New Jersey's fair report privilege); *Monge v. Univ. of Pa.*, 2023 WL 3571935, at **5-6 (E.D. Pa. May 19, 2023) (granting motion to dismiss based on Pennsylvania's fair report privilege).

### B.    The Article Is Not Materially False.

While Plaintiffs base their defamation claim on dozens of statements and alleged implications in the Article, they cannot show that a single one of them is a materially false statement of fact. Many are protected opinions, *see* Part II.C *infra*, but even if viewed as factual statements, the Demolition Order, public records, and Plaintiffs' own concessions demonstrate the substantial truth of all of them.

***Drug activity at Triple X.*** Plaintiffs attempt to deny the existence of an "organized drug market" at Triple X, *see, e.g.*, Compl. ¶ 91 (quoting Article at 15), but they are estopped from

doing so by the Demolition Order, which expressly found that "open illegal narcotics usage and sales" occurred on the property under Plaintiffs' ownership, Demolition Order at 45. Among other evidence, the court credited the testimony of a police officer who described the property as "a hive of criminal activity stemming from narcotics sales" and recounted seeing "thousands of needles" and other drug paraphernalia inside the building. *Id.* at 30-32.

Plaintiffs' effort to draw a distinction between drug sales on the vacant lots adjoining the Triple X building (which they concede occurred) and drug sales inside the building (which they deny occurred), Compl. ¶¶ 37, 91, is untenable. Nothing in the Article suggested that drug sales took place within the Triple X building, rather than on the surrounding property that Plaintiffs also owned. *See, e.g.*, Article at 3 ("Dealers set up tables in the lots outside, as if for a farmer's market, to sell illicit narcotics."); *id.* at 15 (police sent "officers and city workers to clear the lots at Triple X"). Nor does the precise location of the drug sales make any material difference to Plaintiffs' reputation; the gist and sting of the Demolition Order as well as the Article is that drug activity was rampant at the Triple X complex.

**Shooting suspect seeking refuge in the Triple X building.** Although Plaintiffs dispute the precise details of the incident, they admit that a shooting suspect ran into the Triple X building to seek refuge in August 2022. Compl. ¶¶ 46-52. The Demolition Order further confirms that a police SWAT team was called to the property on August 30, 2022 "due to a shooting that had occurred where an individual had run into the" building. Demolition Order at 27. Plaintiffs' focus on whether the shooting resulted in the victim's death or the perpetrator was convicted is beside the point. The Article did not suggest that the shooting itself took place on the Triple X property. *See* Article at 24, 31. Nor did the Article imply that "Ehrlich gave safe harbor to a murderer." Compl. ¶ 49. The gist and sting of the Article was that a shooting suspect

was able to enter the Triple X building and use it as a hiding place, which is entirely accurate and undisputed.

Plaintiffs also take issue with the Article's statement that this incident "made shutting down the complex a City priority," Compl. ¶¶ 49, 52, but its substantial truth is demonstrated by the City's Emergency Petition, which cited the incident as a justification to demolish the Triple X building. *See* Emergency Petition ¶ 22 (alleging that Triple X "was the location of a deadly shooting on August 30, 2022, with the shooter finding refuge within the subject premises, which is open to the public"). Plaintiffs' disagreement with that justification is irrelevant. Plaintiffs complain that the Article did not "quote any City Officials," Compl. ¶ 52, but the Inquirer had no obligation to do so to support this indisputable fact established by the Emergency Petition.

**Ehrlich's personal responsibility for conditions at Triple X.** Throughout the Complaint, Plaintiffs seek to distance themselves from the dire conditions at Triple X under their ownership, but the Demolition Order precludes them from denying responsibility. While Plaintiffs emphasize that A Kensington Joint purchased the property rather than Ehrlich individually, Compl. ¶¶ 29-30, the Demolition Order found that Ehrlich owned fifty percent of the property and "singularly controlled" A Kensington Joint, which owned the other fifty percent, Demolition Order at 69-70. The Demolition Order further concluded that Ehrlich had "actively and passively enabled this exacerbating public nuisance and increased the risk of harm to all concerned from escalating criminal activity," *id.* at 71, "turning a completely blind eye to the rampant drug use and criminality that had been openly occurring" there, *id.* at 73. Indeed, it was Ehrlich's "disconnection from appreciating the harmful consequences of his abdication of his Property ownership responsibilities" that led the court to conclude that demolition was the only way to remedy the unsafe conditions at the Triple X property. *Id.* at 65-66. Based on these

findings and others, the Demolition Order held A Kensington Joint and Ehrlich "individually and jointly responsible" for the costs of demolition.  *Id.* at 3.

Even in the absence of the Demolition Order, the Article's attribution of responsibility to Ehrlich for the conduct of his LLCs would be substantially true.  Ehrlich is admittedly "a principal" of A Kensington Joint, as well as Good Bet.  Compl. ¶ 1.  Courts have refused to find material falsity where a journalist misattributes the actions of a company to an individual who owns or runs the company.  *See, e.g.*, *Campbell v. Bank One*, 79 F. App'x 760, 762 (6th Cir. 2003) (holding that statement that company president had deposited checks was substantially true where in fact another company representative had made deposits); *Hudak v. Times Publ'g Co.*, 534 F. Supp. 2d 546, 567 (W.D. Pa. 2008) (accusation of attorney's poor performance was substantially true where attorney conceded his staff had poorly performed, since attorney "is ultimately responsible for the acts of his own agents and, therefore, a staff members' mishandling of a client's case inevitably reflects poorly on" attorney); *Saferin v. Malrite Commc'ns Grp., Inc.*, 2000 WL 299454, at *5 (Ohio Ct. App. Mar. 24, 2000) (statement that doctor personally pleaded guilty to insurance fraud was substantially true even though plea was actually entered by medical corporation of which doctor was president and majority owner).

***Ehrlich's personal responsibility for blight in Kensington.***  Plaintiffs also dispute the Article's broader conclusion that Ehrlich has contributed to blight in Kensington through his real estate practices, *e.g.*, Compl. ¶¶ 36, 41, but this too is established by the Demolition Order.  The court found that Triple X was just one of Ehrlich's "'Monopoly Game' investment properties," Demolition Order at 76, and that Ehrlich had displayed "a persistent and patterned business practice of buying and holding dilapidated properties, failing to make repairs, allowing them to become unsafe or imminently dangerous properties, and attempting to minimize and not pay the

normal carrying costs associated with ownership of those properties by avoiding taxes or other municipal liabilities," *id.* at 74. Thus, Plaintiffs are estopped from denying that Ehrlich "played a role in causing or exacerbating the ongoing public health and safety issues" there. Compl. ¶ 34.[5]

Nor can Plaintiffs reasonably argue that the Article implied Ehrlich was singlehandedly responsible for all Kensington's problems. They object to the placement of Ehrlich's photograph in close proximity to the print headline "How speculators fueled a drug crisis," *id.* ¶¶ 21, 24-25, but the headline itself made clear that the Article was about a group of speculators and not Ehrlich alone. Reviewing the Article as a whole, as the law requires, would further dispel any impression that Ehrlich was solely to blame for the blight. *See Lavin v. N.Y. News, Inc*., 757 F.2d 1416, 1420-21 (3d Cir. 1985) (rejecting defamation claim where headline's meaning was clarified by article); *Merriweather v. Phila. Newspapers Inc.*, 61 Pa. D. & C. 4th 423, 437 (Phila. Cnty. C.C.P. 2002) (no defamatory meaning where text of article "*expressly states* the contrary of what plaintiff claims the headline" implies), *aff'd*, 835 A.2d 842 (Pa. Super. 2003).

***Number of code violations attributed to Ehrlich's Kensington properties.*** Plaintiffs wrongly contend that the Article's statement that Ehrlich's "properties in Kensington alone have racked up some 500 code violations since 2014," Article at 13, and the Good Bet Graphic illustrating this point, *id.* at 21, are "factually inaccurate and misleading," Compl. ¶ 62. To the contrary, the statement and Good Bet Graphic are protected by the fair report privilege as fair and accurate summaries of City data and records, and, in any event, both are substantially true.

---

[5] At any rate, the assignment of blame to Ehrlich based on the facts disclosed in the Article is protected opinion. *See, e.g.*, *Norman v. Greene*, 2025 WL 2555819, at *6 (Pa. Super. Sept. 5, 2025) (defendant's attribution of fault to plaintiff for car accident was protected opinion based on disclosed facts).

17

Plaintiffs first argue that the graphic's reference to Good Bet, the company through which Ehrlich markets his various companies' properties, is incorrect because Good Bet "does not directly own any of the properties." *Id.* ¶ 56. Yet Plaintiffs do not deny the Article's assertion that Ehrlich "does business as Good Bet Trading," or that each of the 134 properties included in the Good Bet Graphic belongs to one of Ehrlich's many companies. Article at 12, 21; *see also* Demolition Order at 40 (Ehrlich "created and exercised complete control as sole member over" Good Bet). The attribution of conduct to one of these companies instead of another, when Ehrlich owns all of them, is not materially false. *See, e.g., Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1294, 1295-96 (D.C. Cir. 1988) (statement that one company published controversial pamphlet instead of another company with which it shared "substantial ties" was not materially false); *Oaks Gallery & Country Store-Winona, Inc. v. Lee Enters., Inc.*, 613 N.W.2d 800, 803-04 (Minn. Ct. App. 2000) (report concerning one closely held corporation's failure to pay property taxes was substantially true when in fact it was second closely held corporation, under direction of same individuals, that owed property taxes); *Oak Grove Cremation Ctr., Inc. v. Peterson*, 2007 WL 1452235, at *1 (Mich. Ct. App. May 17, 2007) (statements that one company was engaged in "questionable ethical and legal issues" were substantially true based on conduct of "an affiliated company").

Without pointing to any specific inaccuracies, Plaintiffs claim that the Good Bet Graphic attributed to Ehrlich "code violations which predated the Plaintiff's or any other affiliated LLC's ownership." Compl. ¶ 62. But public records related to Ehrlich's properties, of which this Court may take judicial notice,[6] show otherwise. Exhibit E to the Berry Declaration includes records

---

[6] *See* Fed. R. Evid. 201(b)(2); *Gagliardi v. Kratzenberg*, 188 F. App'x 86, 89 n.3 (3d Cir. 2006) (court "may take judicial notice of public records," including "publicly recorded deeds").

of L&I violations and deed transfers for each of the 134 properties depicted in the Good Bet Graphic. *See* Berry Decl. ¶ 6. These public records are made available by the City in three sources: (1) a database of L&I code violations (the "L&I Database"), (2) a database of deed transfers (the "Deed Records Database"), and (3) datasets about L&I code violations on the OpenDataPhilly website (the "L&I Code Violations Dataset"). *Id.* ¶¶ 6, 7. Exhibit F to the Berry Declaration provides a summary of the information contained in those records, showing the date on which one of Ehrlich's companies first purchased each property, the number of code violations from that purchase date to the date of the Article according to the L&I Database, the number of code violations attributable to one of Ehrlich's companies according to the L&I Code Violations Dataset up to the date of the Article, and the number of code violations from the date of the Article to the present according to the L&I Database. *See* Berry Decl. ¶ 10.

The L&I Code Violations Dataset indicates that Ehrlich's Kensington properties incurred as many as 510 violations under his companies' ownership before the Article was published. *Id.* Ex. F. The Good Bet Graphic's statement that there were "at least 500 hundred code violations," Article at 21, is therefore a fair and accurate summary of official reports protected by the fair report privilege. *Binder*, 275 A.2d at 57; *Mosley*, 629 A.2d at 970.

The information in the L&I Database and Deed Records Database establish a total of 449 L&I violations for properties owned by Ehrlich-controlled entities prior to publication of the Article. Berry Decl. Ex. F. Thus, Plaintiffs' allegation that "the bulk of the cited code violations predated [Ehrlich's] or any affiliated LLC's ownership" is incorrect. Compl. ¶ 61.

Whatever discrepancy might exist in the data for a handful of Ehrlich's individual properties and the Good Bet Graphic's statement that there were "at least 500 hundred code violations" is immaterial. Regardless of whether the number of violations at the time of the

Article's publication was 449, 510, or "at least 500," the gist and sting of the statement and graphic – that Ehrlich's properties in a single neighborhood incurred hundreds of code violations – is the same. *See, e.g.*, *Croce v. N.Y. Times Co.*, 345 F. Supp. 3d 961, 987 n.5 (S.D. Ohio 2018) ("[D]efamation case law affords leeway in the reporting of numbers if the discrepancy does not alter the gist of what is being reported and does not produce a different effect in the mind of the reader."), *aff'd*, 930 F.3d 787 (6th Cir. 2019); *Konarski v. Raycom Am., Inc.*, 2006 Ariz. App. Unpub. LEXIS 505, at *20-21 (Ariz. Ct. App. June 29, 2006) ("Although we acknowledge there is a difference between having four complaints or nine lodged against [plaintiffs], in the context of this case the difference is not material."); *Koniak v. Heritage Newspapers*, 499 N.W.2d 346, 348 (Mich. Ct. App. 1993) ("[W]hether plaintiff assaulted his stepdaughter once, eight times, or thirty times would have little effect on the reader."); *Bustos v. A&E Television Networks*, 646 F.3d 762, 765 (10th Cir. 2011) ("To qualify as material the alleged misstatement must be likely to cause reasonable people to think significantly less favorably about the plaintiff than they would if they knew the truth; a misstatement is not actionable if the comparative harm to the plaintiff's reputation is real but only modest." (cleaned up)).[7]

Furthermore, the public records show that Ehrlich's properties have incurred additional violations since the publication of the Article, bringing the total number to over 500 regardless. *See* Berry Decl. Ex. F.  Plaintiffs cannot claim any reputational harm based on alleged false statements of fact that have since become entirely true.  *See Bustos*, 646 F.3d at 764 ("[T]he truth, whenever discovered, serves as a complete defense."); *Haynes v. Alfred A. Knopf, Inc.*,

---

[7] If anything, the Good Bet Graphic's caption describing it as "an analysis of L&I violations since 2014," Article at 21, was favorable to Plaintiffs, since it could be read to suggest that the Inquirer was counting violations over a longer time period than the shorter time it actually took for Ehrlich-controlled properties to accumulate hundreds of violations.

8 F.3d 1222, 1228 (7th Cir. 1993) ("The rule of substantial truth is based on a recognition that falsehoods which do no *incremental* damage to the plaintiff's reputation do not injure the only interest that the law of defamation protects.").

Plaintiffs also complain the Good Bet Graphic includes properties with zero violations, which they argue makes "the Ehrlich's causal 'footprint' appear larger to the reader." Compl. ¶ 57. The caption to the Graphic makes clear, however, that the size of each circle on the map "is proportional to the number of code violations at the property ranging from zero to 29." Article at 21. A reader of the web version of the Graphic could click on the smallest circles and see those properties had zero violations. *See, e.g.*, Berry Decl. Ex. E. Plaintiffs assert that a reader of the print version would be unable to determine which properties had zero violations, suggesting the Inquirer should have used "some other sort of indicator" besides circles for those properties. Compl. ¶ 58. But that is exactly what the print version of the Good Bet Graphic did: It used a small white square instead of an orange circle for each property with zero violations:



21

Berry Decl. Ex. C at 4; *see Youkelsone v. Wash. Mut., Inc.*, 741 F. App'x 88, 91 n.3 (3d Cir. 2018) (court need not "credit factual allegations contradicted by matters of which [it] may take judicial notice").

   ***Ehrlich's attitude toward code enforcement.***  Plaintiffs allege that the Article "falsely attributed" to Ehrlich "a dismissive attitude toward code enforcement," Compl. ¶ 86, by paraphrasing a statement he made during an interview as follows: "It's cheaper to ignore violations for trash or weeds, he said – shifting the burden to the city to clean up his properties and send him the bill."  Article at 13.  Plaintiffs do not outright deny that Ehrlich made such a statement, instead alleging that the Inquirer's reporters "misconstrued" what he meant by "[a]ny comment" he "may have made regarding code enforcement or property maintenance."  Compl. ¶¶ 65, 67; *see also id.* ¶ 65 ("Ehrlich questions having made such a statement").  Even if that quasi-denial were enough to meet Plaintiffs' burden of pleading falsity, the gist and sting of the paraphrased statement are no worse than the litany of findings in the Demolition Order about Ehrlich's unwillingness to do the bare minimum to maintain his properties.  *See, e.g.*, Demolition Order at 72 (Ehrlich has "amply demonstrated not only a historically documented non-compliance with statutory requirements, but a steadfast refusal to be responsible for even the most basic maintenance"); *id.* at 74 (Ehrlich has "evidenced a persistent and patterned business practice of buying and holding dilapidated properties, failing to make repairs, allowing them to become unsafe or imminently dangerous properties, and attempting to minimize and not pay the normal carrying costs associated with ownership of those properties by avoiding paying taxes or other municipal liabilities").  Plaintiffs are precluded from re-litigating these findings about his attitude toward code enforcement.

*Immaterial facts.*  Other alleged inaccuracies – such as a description of the Triple X building as "empty" at the time of purchase, Article at 2; Compl. ¶ 31,[8] and the statement that Ehrlich "moved into real estate as a professional sheriff sale buyer in the 2000s" rather than 2013, Article at 12; Compl. ¶ 27 – are not actionable because any falsity is immaterial and would not "grievously fracture[]" Plaintiffs' reputation in the community.  *Tucker*, 848 A.2d at 123.

### C.    Many of the Challenged Statements Are Constitutionally Protected Opinions.

As detailed below, many of the statements on which Plaintiffs base their defamation claim are also protected opinions.

*Ehrlich's profit motive.*  Though Plaintiffs do not (and could not) dispute the Article's description of Ehrlich as a "speculator," Article at 2, they challenge the statement that "Cleaning up Kensington could pave the way for surging development and soaring property values – leaving the same speculators who enabled the disorder and disrepair poised to cash in," *id.* at 4; Compl. ¶ 71.  Similarly, they object to the quotation of a Kensington resident who viewed Ehrlich as no better than the drug dealers at Triple X because both were "cashing in on other people's misery."  Article at 15; Compl. ¶¶ 72, 95.  These statements are protected as opinions based on the many disclosed facts in the Article about Ehrlich's pattern of purchasing blighted properties and holding them until they appreciate in value, the hundreds of code violations his properties have incurred in Kensington alone, and the circumstances that led to the City's demolition of the Triple X building.  *See, e.g.*, *Alston v. PW-Phila. Wkly.*, 980 A.2d 215, 220-21 (Pa. Commw. 2009) (statement that plaintiff was "no more than a land speculator who cloaks himself in the guise of a community activist" was protected opinion based on facts disclosed in

---

[8] This statement is true.  According to the Demolition Order, Ehrlich filed a tax appeal shortly after buying the Triple X building in which he stated that the property was a "*Former* XXX video store" and now "Vacant."  Demolition Order at 59 (emphasis added).

article).  The comparison of Ehrlich to drug dealers is also rhetorical hyperbole.  *See, e.g.*, *Dunn v. Gannett N.Y. Newspapers, Inc.*, 833 F.2d 446, 454-55 (3d Cir. 1987) (comparison of plaintiff to "two notorious dictators" was protected because it could "be characterized as no more than lusty and imaginative expression of contempt" (cleaned up)).  To the extent these statements imply "that Ehrlich has an unethical profiteering motive," Compl. ¶ 71, they also are protected opinion because they are incapable of being proved false.  *See McCafferty*, 955 F.3d at 359 ("Everyone is free to speculate about someone's motivations based on disclosed facts about that person's behavior."); *Kane v. Chester Cnty.*, 811 F. App'x 65, 70 (3d Cir. 2020) (statement that plaintiff's conduct was "unethical" was protected opinion); *Monge v. Univ. of Pa.*, 2023 WL 2648201, at *7 (E.D. Pa. Mar. 24, 2023) (same).

Plaintiffs insist that Ehrlich has not yet "derived substantial net income from the Kensington properties," Compl. ¶ 97, but the Article never stated or implied that he had.  The Article noted that Ehrlich and other Kensington property owners could profit at some point in the future, once conditions in the neighborhood improve.  *See* Article at 4, 12.  In any event, a prediction of future events based on disclosed facts is also protected as opinion.  *See, e.g.*, *Jankowicz*, 2025 WL 2630572, at *4 ("speculation and conjecture about [plaintiff's] motives, goals, and future actions" were "not readily verifiable" as true or false).

***Characterization of Triple X as a locus for drug activity in Kensington.***  The Article's reference to Triple X as "ground zero" for drug activity in Kensington, Article at 2; Compl. ¶¶ 39, 41-42, and quotation of a community leader who called the property "the most egregious operation on the Avenue," Article at 15; Compl. ¶ 90, are protected expressions of opinion.  These statements were based on facts disclosed in the Article, including the presence of drug dealers who sold narcotics from tables in the complex's vacant lots and rented out tents where

24

customers could get high.  Article at 3.  Plaintiffs argue that the Article unfairly singled out

Ehrlich's property when "drug activity was everywhere and ubiquitous in Kensington," Compl.

¶ 42, but there is no question that significant drug activity occurred at Triple X in particular.  *See*

*supra* at 7-8 (discussing Demolition Order's findings).  The Inquirer's decision to highlight

Ehrlich and his companies in the Article was well within its editorial discretion.  *See Miami*

*Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a

newspaper, and the decisions made as to limitations on the size and content of the paper, and

treatment of public issues and public officials – whether fair or unfair – constitute the exercise of

editorial control and judgment.").  Whether Triple X was actually "ground zero" or "the most

egregious" in the neighborhood is entirely subjective and incapable of being proved false.  *See,*

*e.g.*, *Pacira*, 63 F.4th at 245 ("[s]tating that something is 'not superior' or 'inferior' is the type of

'loose' or 'figurative' language" that is protected opinion); *Dodds v. Am. Broad. Co.*, 145 F.3d

1053, 1066 (9th Cir. 1998) (statement that plaintiff was one of "the three worst judges in the

country" was "in the nature of an opinion rather than the type of factual assertion that can be

proved to be demonstrably false"); *SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund*

*Ltd.*, 2022 WL 493600, at *3 (S.D.N.Y. Feb. 17, 2022) (terms such as "dirtiest" and "the most

filthy" are "inherently understood to be hyperbolic because they are the superlative of an

adjective that conveys an inherently subjective concept" (cleaned up)).

    ***Statement that "the next spot may be another Ehrlich property."***  The Article's

statement that "the next spot" for drug activity "may be another Ehrlich property," Article at 32,

is likewise protected as opinion.  It is a prediction of future events based on disclosed facts that

Plaintiffs do not even attempt to dispute – namely, that Ehrlich had recently allowed a group of

people to move into a warehouse he purchased, where "trash and needles" had "piled up outside," dealers would "come and go all day long," and the City had "issued 19 violations." *Id.*

### D.    Many of the Defamatory Meanings Plaintiffs Allege Are Unreasonable.

Throughout the Complaint, Plaintiffs draw defamatory meanings from an "unfair and forced construction" of the Article. *Bogash*, 176 A.2d at 679.

*Alleged prostitution front.* Plaintiffs maintain that the Article implied Ehrlich "knowingly purchased or operated a property that was an active front for prostitution," Compl. ¶ 33, a theory wholly unsupported by the text of the Article. The Article stated that Ehrlich purchased "an empty storefront that once housed an adult bookstore and alleged prostitution front," Article at 2, thus indicating that the prostitution front was no longer active at the time Ehrlich acquired Triple X. The Article reinforced this point by including a more than 25-year-old file photograph – clearly labeled as having been taken in 1997 – of "Kensington residents protesting prostitution and other nuisance behavior at the adult bookstore that once inhabited the Triple X building." Article at 14.

*Involvement in criminal activity.* Plaintiffs also claim that the Article imputed "serious criminality" to Ehrlich himself by discussing the existence of an "organized drug market at Triple X" under his ownership. Compl. ¶¶ 38, 94. While the Article accurately portrayed Ehrlich's actions to combat the drug dealing on his property as ineffectual, it did not in any way suggest that Ehrlich welcomed or participated in the criminal activity. *See, e.g.*, Article at 23 ("The boundaries he set, such as barring drug dealers, didn't work."). Plaintiffs cannot maintain a defamation claim based on an implication of "serious criminality" when the Article "explicitly refuted any such implication." *ToDay's Hous.*, 21 A.3d at 1216.

*References to other properties and other property owners.* Certain statements Plaintiffs challenge are not even about them. As the headline makes plain, the Article takes a much

26

broader view than Ehrlich and his companies alone.  *See* Article at 1 ("How speculators fueled a nightmare for Kensington residents – and could soon cash in").  Much of the Article discusses other property owners' contributions to blight in Kensington and the City's policy responses, yet Plaintiffs unreasonably construe some of these statements as referring to them.  For example, Plaintiffs object to the Article's quotation of a Kensington resident about four "drug houses" on "a block of Hart Lane," Article at 8; Compl. ¶ 40, even though the surrounding paragraphs say nothing about Plaintiffs or Triple X.  Likewise, Plaintiffs challenge a statement about three "lots *near* Triple X on Hart Lane," which the preceding sentence makes clear are "owned by the city or the Philadelphia Land Bank," not Ehrlich.  Article at 9; Compl. ¶ 44.  Reading these statements in the context of the Article as a whole, the meanings alleged by Plaintiffs are unreasonable.

## III.    THE INQUIRER IS IMMUNE UNDER PENNSYLVANIA'S ANTI-SLAPP LAW AND ENTITLED TO RECOVER ITS ATTORNEYS' FEES AND COSTS.

Last year, Pennsylvania enacted the Uniform Public Expression Protection Act ("PA-UPEPA"), 42 Pa.C.S. § 8340.11 *et seq.*, a statute designed to remedy strategic lawsuits against public participation, otherwise known as "SLAPP" suits.  The law seeks to deter "lawsuits brought primarily to chill the valid exercise of" speech and to "encourage continued participation in matters of public significance."  *Id.* § 8340.12(1), (2).  It achieves this objective by "grant[ing] immunity to those groups or parties exercising the rights to protected public expression," *id.* § 8340.12(3)(i), and providing a mandatory award of attorneys' fees and costs for parties who are forced to defend against claims from which they are immune.[9]  Ehrlich's

---

[9] *See* Michael Berry & Kaitlin M. Gurney, *Pennsylvania Joins States Enacting Tough Anti-SLAPP Protections: The New Uniform Public Expression Protection Act*, 96 Pa. Bar Ass'n Q. 9-28 (Jan. 2025) (providing detailed overview of PA-UPEPA), *available at* https://bit.ly/3DPf7Jo.

lawsuit epitomizes what PA-UPEPA was enacted to prevent:  a meritless SLAPP suit targeting speech on a matter of public concern – here, a news report about the role real estate speculators have played in perpetuating blight, crime, and drug use in Kensington.

The immunity provided under PA-UPEPA is implicated whenever a defendant faces "a cause of action based on protected public expression."  *Id.* §§ 8340.14(a), 8340.15.[10] PA-UPEPA defines "protected public expression" to include any exercise of the "constitutional rights of speech [or] press" "on a matter of public concern."  42 Pa.C.S. § 8340.13(3).  "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."  *Snyder v. Phelps*, 562 U.S. 443, 453 (2011).  The Article's reporting about Kensington is plainly a matter of public concern.

Where, as in this case, a claims is based on "protected public expression," PA-UPEPA provides that a defendant "is immune from civil liability" if the plaintiff fails to "state a cause of action upon which relief can be granted."  42 Pa.C.S. § 8340.15(1)(ii).  Because Ehrlich has failed to state a claim, the Inquirer is immune under PA-UPEPA.  Accordingly, it is entitled to recover its attorneys' fees, court costs, and "expenses of litigation."  *Id.* § 8340.18(a)(1).  This

---

[10] As the commentary to the law explains, this immunity is "substantive in nature."  *Id.* § 8340.13 Uniform Law Cmt. 2; *id.* § 8340.14 Uniform Law Cmt. 2 ("The point of the anti-SLAPP statute is that you have a right not to be dragged through the courts because you exercised your constitutional rights.").  For this reason, the new statute is codified in the subchapter of the Pennsylvania Consolidated Statutes dedicated to immunities.  *See* 42 Pa.C.S. Chap. 83, Subchs. C, C.1.  And, accordingly, the Pennsylvania law explicitly states that it "grants immunity" and provides for when "a person is immune from civil liability."  42 Pa.C.S. §§ 8340.12(1), 8340.15.  As one federal court recently held, the immunity conferred by PA-UPEPA protects a defendant's "right not to stand trial."  *Salaam v. Trump*, 2025 WL 2375397, at *1 n.1 (E.D. Pa. Aug. 15, 2025).

award is mandatory:  The law provides that a "court shall award" an immune party these

damages.  *Id.*  Thus, if the Court dismisses Plaintiffs' claims, the Inquirer is entitled to recover its

attorneys' fees, costs, and expenses of litigation.[11]

## CONCLUSION

For the foregoing reasons, the Inquirer respectfully requests that the Court grant its

motion to dismiss pursuant to Rule 12(b)(6) and declare that it is immune pursuant to

PA-UPEPA.[12]

---

[11] PA-UPEPA's immunity and fee-shifting provisions apply in federal court, as both are substantive state laws that do not conflict with federal law.  *See, e.g.*, *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975) (explaining that statutory right to attorneys' fees reflects "a substantial policy of the state" and "should be followed" in ordinary diversity cases); *Ali v. McClinton*, 2017 WL 2588425, at *2 (E.D. Pa. June 14, 2017) ("[U]nder the *Erie* doctrine, state rules of immunity govern actions in federal court alleging violations of state law.").  They are consistent with the procedures set forth in the Federal Rules, which provide that a case should be dismissed when a plaintiff fails to state a claim, *see* Fed. R. Civ. P. 12(b)(6), and that a party can seek attorneys' fees under a "statute . . . entitling the movant to the award," Fed. R. Civ. P. 54(d)(2)(B)(ii).  While two courts have held that aspects of PA-UPEPA do not apply in federal court, the defendants in those cases did not move to dismiss under the Federal Rules, and the holdings did not address the availability of the statutory immunity and mandatory fee award when a defendant moves under the Federal Rules, as the Inquirer has done here.  *See Salaam v. Trump*, 2025 WL 1789648, at *6 (E.D. Pa. June 27, 2025) (explaining that defendant moved "solely under Pennsylvania's Anti-SLAPP Statute" and expressly not deciding whether the law's attorneys' fee provision applies in federal court); *Jakes v. Youngblood*, 782 F. Supp. 3d 210, 220 (W.D. Pa. 2025) (same).

[12] The Inquirer will submit a motion for its attorneys' fees, costs, and expenses should the Court grant its motion to dismiss.

Dated: October 27, 2025

Respectfully submitted,

BALLARD SPAHR LLP

By:  */s/ Michael Berry*
    Michael Berry
    berrym@ballardspahr.com
    Elizabeth Seidlin-Bernstein
    seidline@ballardspahr.com
    1735 Market Street, 51st Floor
    Philadelphia, PA 19103-7599
    Telephone: 215.665.8500
    Facsimile: 215.864.8999

*Counsel for Defendants The Philadelphia Inquirer LLC, Samantha Melamed, Max Marin, Michelle Myers, Anton Klusener, and Dylan Purcell*