**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ADAM EHRLICH, GOOD BET TRADING, LLC, and A KENSINGTON JOINT, LLC,** | : : : : | **CIVIL ACTION** |
| *Plaintiffs,* | : : | |
| **v.** | : : | |
| **THE PHILADELPHIA INQUIRER, LLC *et al.,*** | : : : | **No. 25-4620** |
| *Defendants.* | : : | |

**<u>MEMORANDUM</u>**

Perez, J.                                                                                          June 16, 2026

The First Amendment does not reserve its protection for polite journalism. It protects reporting that is sharp, skeptical, accusatory, and uncomfortable—especially when the reporting concerns matters of public concern, such as a neighborhood drug crisis and the community's response to it. Such breathing room is essential here. The Philadelphia Inquirer's August 12, 2024 article about Kensington is a work of investigative journalism on matters of obvious public importance, yet much of Plaintiffs' defamation claim in this case asks this Court to treat civic judgment, policy criticism, and rhetorical force as actionable fact. The Court will not do that.

However, while the First Amendment protects forceful journalism, it does not shield factual assertions from scrutiny. Defamation law still applies when a publication plausibly communicates concrete, verifiable, and materially false facts about a private plaintiff. At the pleadings stage, that narrow distinction controls the outcome. The Inquirer Defendants' motion will be granted in

1

substantial part and denied in limited part.[1] Count I will proceed only on four tightly confined theories. The rest of Count I does not survive.

Plaintiffs Adam Ehrlich, Good Bet Trading LLC, and A Kensington Joint LLC sued The Philadelphia Inquirer, LLC, Samantha Melamed, Max Marin, Dylan Purcell, Michelle Myers, Anton Klusener, and Drew Aldinger, along with the City of Philadelphia and Doe defendants. Count I asserts defamation against the Inquirer Defendants. Counts II and III assert constitutional claims against the City-related defendants arising from alleged government use or adoption of the article and from City conduct toward Plaintiffs. Those City claims are not resolved in this Memorandum. This Memorandum decides only the Inquirer Defendants' motion to dismiss Count I. ECF No. 22.[2]

## I.     BACKGROUND

This case arises from an August 12, 2024 Philadelphia Inquirer article ("the Article") titled "How speculators fueled a nightmare for Kensington residents — and could soon cash in." Compl ¶ 18, ECF No. 1. The Article reported on Kensington's drug crisis, neighborhood blight, vacant and distressed properties, code enforcement, and real estate investment in an area that has become central to Philadelphia's public debate over crime, public health, and redevelopment.

---

[1] Plaintiffs' withdrawn opposition is not considered in resolving the Inquirer Defendants' motion. Plaintiffs initially opposed the motion, then filed a Rule 11 correction and partial retraction identifying citation and quotation errors, and later withdrew the opposition in its entirety after identifying additional citation and quotation issues. *See* ECF Nos. 34, 36. The withdrawal leaves no operative opposition to the Inquirer motion, and the Court will not parse the withdrawn brief for usable factual assertions, quotations, concessions, or legal characterizations. That said, the motion should not be granted solely by default. Although Local Rule 7.1(c) permits a motion to be granted as uncontested in the absence of a timely response, a Rule 12(b)(6) motion still requires the Court to determine whether the Complaint states a claim. *See Stackhouse v. Mazurkiewicz*, 951 F.2d 29, 30 (3d Cir. 1991).

[2] This case also sits beside another dispute involving some of the same property and actors. In *Ehrlich v. City of Philadelphia*, No. 25-4366, this Court addressed a different Rule 12(b)(6) motion concerning City conduct at 2837 Kensington Avenue, known as the Triple X property. The Court there dismissed claims against Mayor Cherelle Parker and former Mayor James Kenney in their individual capacities and dismissed the substantive due process count, while leaving other theories to proceed or be amended. *See* No. 25-4366, ECF Nos. 13, 14. That ruling matters as background but it does not decide whether the Inquirer defamed Plaintiffs, and it does not transform a media-defendant motion into a municipal liability ruling.

Plaintiff Adam Ehrlich is a Philadelphia real estate investor. Through entities including co-Plaintiffs Good Bet Trading LLC and A Kensington Joint LLC, he buys, sells, markets, and holds interests in distressed properties and vacant land, including in Kensington. *Id.* ¶¶ 1–3, 16. A Kensington Joint LLC purchased the property at 2837 Kensington Avenue, referred to in the Article and the Complaint as "Triple X." *Id.* ¶¶ 28–30.

The Article made Ehrlich a central figure in its account of Kensington's deterioration. It identified him as "a real-estate speculator" and stated that, after he bought Triple X, the property was added "to a portfolio of more than 125 properties in Kensington, and close to 800 citywide." Compl. Ex. A, ECF No. 1-1 at 4. The Article also stated that "[a]bsentee landlords and real estate speculators such as Ehrlich have fueled Kensington's degradation for decades, often with little intervention from City Hall." *Id.* at 5. Plaintiffs contend that the Article used those facts not merely to describe Ehrlich's holdings, but to portray him as one of the principal drivers of Kensington's decline. Compl. ¶¶ 26, 36. The Article's headline reinforced that framing: "How speculators fueled a nightmare for Kensington residents — and could soon cash in." Compl. Ex. A, ECF No. 1-1 at 2. Plaintiffs allege that the online search-result title made the accusation sharper still: "Kensington real-estate speculators are fueling the drug crisis." *Id.* ¶ 19.

The Inquirer published the Article prominently: it was featured in the Sunday edition as a front-page "Special Report," paired the story with a large photograph of Ehrlich, and placed that photograph near language tying "speculators" to Kensington's drug crisis. *Id.* ¶¶ 20–24. The presentation did more than identify Ehrlich as one investor among many. According to Plaintiffs, the headline, front-page placement, photograph, online title, and visual packaging worked together to cast Ehrlich as the face of a broader civic failure: real-estate speculation that helped fuel open-air drug activity, blight, and neighborhood disorder. *Id.* ¶¶ 19–24. The Article also included the interactive graphic "Goodbet's Footprint of Blight," which Plaintiffs say visually connected Good Bet to

3

distressed Kensington properties and code violations in a way that suggested ownership, control, and responsibility. *Id*. ¶¶ 55–58. Those presentation choices matter to Plaintiffs' false-gist theory, which depends not only on isolated sentences but on the Article's cumulative impression.

Much of the Article focused on Triple X. The Article described Triple X as "a fenced-in compound that encompassed two vacant lots and an empty storefront that once housed an adult bookstore and alleged prostitution front, with a fading 'XXX' sign above the door." Compl. Ex. A, ECF No. 1-1 at 3. It went on to say that "a real-estate speculator, Adam Ehrlich, had bought the empty building in 2020." *Id*. Plaintiffs dispute that characterization. They allege that A Kensington Joint LLC—not Ehrlich individually—purchased the property, and that Ehrlich holds only a member interest in that entity. Compl. ¶¶ 29–30. Plaintiffs do not dispute that Triple X was associated with Ehrlich's real estate operations. They contend, however, that the Article blurred entity distinctions and used the property's pre-acquisition history as an adult bookstore and alleged prostitution front to suggest that Ehrlich was connected to illicit activity that predated Plaintiffs' ownership. *Id*. ¶¶ 31–33.

Plaintiffs next challenge the Article's statements tying Triple X directly to drug activity and public safety conditions on the block. Early in the story, the Article stated that "ground zero sat just 100 feet away" from a resident's home and then identified that location as Triple X, "a fenced-in compound" consisting of two vacant lots and a storefront that had once housed an adult bookstore and alleged prostitution front. Compl. Ex. A, ECF No. 1-1 at 3. The Article then stated that dealers set up "tables in the lots outside" Triple X "to sell illicit narcotics" and "pitched tents" that customers could rent "to get high in private." *Id*. at 4. Later, the Article stated that some properties owned by bulk buyers, "such as the Triple X," had an "outsized impact" on surrounding communities by "attracting crime, drug sales, and gun violence." *Id*. at 7. It also reported that three lots near Triple X on Hart Lane, together with another lot owned by Ehrlich, had "become magnets for drug sales and tent encampments." *Id*. at 10.

The Article then developed that point through its account of conditions at Triple X.  It stated that, "[w]ithin months," Ehrlich "acknowledged" that "the complex was overrun by drug activity," that police and City workers cleared "the lots at Triple X," and that "by the next day, the drug sales were booming once again." *Id*. at 16. It went on to quote Bill McKinney, executive director of the New Kensington Community Development Corp., as calling Triple X "the most egregious operation on the Avenue." *Id*. The Article also described a resident identified as Jaymie buying drugs "in the organized drug market at Triple X." *Id*. Plaintiffs allege that those statements did more than describe nearby street crime. They contend that, read together, the Article falsely suggested that Triple X itself was the central site of an organized narcotics operation and that Plaintiffs knowingly or recklessly permitted the property to serve that role. Compl. ¶¶ 43–45, 91–94.

The Article also invoked a fatal shooting that occurred in August 2022 to connect Triple X with violent crime. It stated that "the problems at Triple X escalated" when a man "shot and killed a person inside a nearby corner store on Kensington Avenue," then "fled into the storefront of the former adult bookstore." Compl. Ex. A, ECF No. 1-1 at 25; Compl. ¶ 46. The Article later stated that "the incident in which the gunman fled into the former storefront[] had made shutting down the complex a City priority." Compl. ¶¶ 49, 52. Plaintiffs allege that this account was materially false: they deny that any murder occurred, deny that public records support the Article's description of a killing, and deny that the incident gave the Inquirer a basis to portray Triple X as refuge for a killer. *Id*. ¶¶ 47–51. Under Plaintiffs' theory, this part of the Article did not merely report neighborhood violence near the property; it supplied a concrete factual anchor for the Article's broader implication that Triple X was dangerous, criminally embedded, and properly targeted for extraordinary City action. *Id.*

Plaintiffs separately challenge the Article's discussion of code violations and blight. In addition to the "Good Bet's footprint of blight" graphic discussed above, the Article stated that

Ehrlich's "properties in Kensington alone have racked up some 500 code violations since 2014." Compl. Ex. A, ECF No. 1-1 at 14; Compl. ¶ 59. Plaintiffs allege that this statement was misleading because it counted violations dating back to 2014 without making clear when Plaintiffs or affiliated entities acquired each property. According to Plaintiffs, many of the properties were not purchased until between 2018 and 2023, and many of the cited violations predated Plaintiffs' or their affiliates' ownership. Compl. ¶¶ 60–64. Plaintiffs therefore contend that the Article blurred two materially different categories of violations: violations that occurred or persisted while Plaintiffs or their affiliates owned the properties, and violations that already existed before they acquired them. *Id.* In Plaintiffs' view, the phrase "racked up" suggested that Plaintiffs caused or allowed a continuous course of code noncompliance, rather than inheriting many distressed properties with preexisting violations. *Id.* ¶¶ 63–64.

The Article also included the statement, attributed in substance to Ehrlich, that "[i]t's cheaper to ignore violations for trash or weeds." *Id.* ¶¶ 65–67. Plaintiffs challenge that sentence because the Article did not present it as a direct quotation, identify who said it, or explain the basis for attributing that view to Ehrlich. *Id.* Ehrlich contends that the sentence inaccurately paraphrased his position and made him appear indifferent to basic property maintenance obligations. *Id.* Read in context, the statement suggested more than a disagreement over municipal enforcement costs. It portrayed Ehrlich as someone who made a deliberate business judgment to disregard trash and weed violations because paying fines was cheaper than complying with the law. *Id.* ¶¶ 65–67, 86–87.

The Article concluded by tying its reporting about Triple X, code violations, and blight to a broader criticism of real estate speculation in Kensington. It stated that cleaning up Kensington could "pave the way for surging development and soaring property values — leaving the same speculators who enabled the disorder and disrepair poised to cash in." Compl. Ex. A, ECF No. 1-1 at 5. The Article later returned to Jaymie, the same resident it had described as buying drugs "in the organized

6

drug market at Triple X." It quoted her as saying that she "saw little to distinguish the dealers from the property owner" because both were "cashing in on other people's misery." *Id*. at 16.; Compl. ¶¶ 72, 95. Plaintiffs allege that this framing did more than criticize Ehrlich's investment strategy. They contend it falsely placed him in the same moral category as drug dealers and implied that he benefited financially from addiction, violence, blight, and neighborhood suffering. Compl. ¶¶ 95–100.

## II.    LEGAL STANDARD

A defendant may move to dismiss a complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6). To survive, the complaint must plead enough facts to state a plausible claim for relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts well-pleaded facts as true and draws reasonable inferences in Plaintiffs' favor, but it does not accept legal conclusions or conclusory characterizations. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

The Article itself may be considered at this stage. A court deciding a Rule 12(b)(6) motion may consider the complaint, exhibits attached to it, matters of public record, and undisputedly authentic documents integral to the claim. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Count I is based on the Article, and the Complaint quotes and relies on it throughout. The Court may therefore read the Article in full to decide what it says, what context it supplies, and whether it is reasonably capable of defamatory meaning.

## III.   GOVERNING DEFAMATION PRINCIPLES

Pennsylvania defamation law starts with statute, then operates under constitutional limits. To state a defamation claim, a plaintiff must plead: (1) the defamatory character of the communication; (2) publication by the defendant; (3) application to the plaintiff; (4) the recipient's understanding of the communication's defamatory meaning; (5) the recipient's understanding that the communication

7

applied to the plaintiff; (6) special harm, when required; and (7) abuse of a conditionally privileged occasion, when applicable. 42 Pa. Cons. Stat. § 8343(a). The defendant bears the burden of proving truth, privilege, and other defenses identified in Section 8343(b). *Id*. § 8343(b).

The Court decides in the first instance whether a challenged communication is capable of defamatory meaning. *MacElree v. Philadelphia Newspapers, Inc.*, 544 Pa. 117, 124–25 (1996); *Thomas Merton Center v. Rockwell International Corp.*, 442 A.2d 213, 215–16 (Pa. 1981). A statement is defamatory only if it tends to harm the plaintiff's reputation, lower the plaintiff in the estimation of the community, deter others from associating with the plaintiff, or adversely affect the plaintiff's fitness for proper conduct of business. *Tucker v. Philadelphia Daily News*, 848 A.2d 113, 124 (Pa. 2004). Embarrassment, annoyance, or sharp criticism is not enough.

Context controls: the Court does not isolate a word, phrase, caption, or sentence and ask whether it can be made defamatory by force. The Court reads the publication as a whole and asks what impression it would naturally produce in the mind of the average reader. *MacElree*, 544 Pa. at 124–25; *Marcone v. Penthouse International Magazine for Men*, 754 F.2d 1072, 1078 (3d Cir. 1985); *Green v. Mizner*, 692 A.2d 169, 172 (Pa. Super. Ct. 1997). A plaintiff's proposed meaning must be one the publication can "fairly and reasonably" bear. *Sarkees v. Warner-West Corp.*, 37 A.2d 544, 546 (Pa. 1944). An "unfair and forced construction" cannot support liability. *Bogash v. Elkins*, 176 A.2d 677, 679 (Pa. 1962).

The contextual rule cuts both ways. It protects writers from liability based on strained readings of isolated language, but it also permits a plaintiff to proceed where the publication's words, structure, images, sequencing, and omissions reasonably convey a defamatory implication. Pennsylvania recognizes defamation by implication: literally true or facially innocent words may be defamatory when, in context, they reasonably convey a false defamatory meaning. *Mzamane v. Winfrey*, 693 F.Supp.2d 422, 477-78 (E.D. Pa. 2010); *Menkowitz v. Peerless Publications, Inc.*, 176 A.3d 968, 980–

81 (Pa. Super. Ct. 2017). The implication must arise from the publication itself. A plaintiff may not enlarge the ordinary meaning of the words, supply speculation, or add defamatory matter the article does not fairly communicate. *Id*.

The First Amendment adds particular force where, as here, a private plaintiff sues media defendants over speech on matters of public concern. In that setting, the plaintiff bears the burden of pleading and ultimately proving falsity. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–77 (1986). The First Amendment does not protect materially false factual assertions, but it does require courts to distinguish actionable falsity from minor inaccuracy, rhetorical force, and protected interpretation. *Id.*

That constitutional rule leaves space for forceful journalism. Public debate is expected to be "uninhibited, robust, and wide-open," and it may include sharp attacks. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Only a statement that can reasonably be understood as stating actual, provably false facts may support a defamation claim. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–21 (1990); *Hill v. Cosby*, 665 F. App'x 169, 174 (3d Cir. 2016). Whether a statement is fact or opinion is a question of law. *Kerrigan v. Otsuka America Pharmaceutical, Inc.*, 560 F. App'x 162, 168 (3d Cir. 2014); *Veno v. Meredith*, 515 A.2d 571, 575 (Pa. Super. Ct. 1986). Where a statement can reasonably be read as either fact or opinion, courts must be sensitive to the chilling effect that would follow from treating ambiguous commentary as actionable fact. *Pacira BioSciences, Inc. v. American Society of Anesthesiologists, Inc.*, 63 F.4th 240, 245 n.9 (3d Cir. 2023).

The protection is strongest for opinions based on disclosed facts. "Opinions based on disclosed facts are absolutely privileged, no matter how derogatory they are." *McCafferty v. Newsweek Media Group, Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020) (cleaned up). The rule exists because readers who receive the underlying facts can evaluate the opinion for themselves. *Hill*, 665 F. App'x at 175–76. A statement cast as opinion may become actionable only if it reasonably implies undisclosed false

and defamatory facts. *Veno*, 515 A.2d at 575; *Parano v. O'Connor*, 641 A.2d 607, 609 (Pa. Super. Ct. 1994). Evaluative commentary based on disclosed facts therefore receives constitutional protection, even when it is harsh. *McCafferty*, 955 F.3d at 357–60; *Pacira*, 63 F.4th at 250–56.

Truth remains a complete defense, and substantial truth is enough. The law "overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991). A statement is not actionable if "the substance, the gist, the sting" of the challenged charge is justified. *Id.* at 517; *ToDay's Housing v. Times Shamrock Communications, Inc.*, 21 A.3d 1209, 1215 (Pa. Super. Ct. 2011). The question is whether the alleged inaccuracy would have a different effect on the mind of the average reader than the truth would have produced. *Masson*, 501 U.S. at 517. At the pleading stage, a plaintiff must allege facts making material falsity plausible. See *Sunrise Pharmaceuticals, Inc. v. Vision Pharma, LLC*, 799 F. App'x 141, 142 (3d Cir. 2020); *Ames v. American Radio Relay League, Inc.*, 716 F. App'x 115, 120 (3d Cir. 2017); *Tannerite Sports, LLC v. NBCUniversal News Group*, 864 F.3d 236, 247 (2d Cir. 2017). The Court may dismiss where the complaint and properly considered materials show that the challenged statement is substantially true. *Ames*, 716 F. App'x at 120.

A plaintiff also must show that the challenged statement is "of and concerning" the plaintiff. Defamatory words must refer to an ascertained or ascertainable person, and that person must be the plaintiff. *Schonek v. WJAC, Inc.*, 258 A.2d 504, 507 (Pa. 1969). A statement about a group, public problem, neighborhood, industry, or public controversy does not automatically become a statement about every person associated with that subject. The publication must be reasonably understood as referring to the plaintiff. *New York Times Co.*, 376 U.S. at 288–89; *Harris v. Easton Publishing Co.*, 483 A.2d 1377, 1385 (Pa. Super. Ct. 1984).

Pennsylvania's fair-report privilege also matters where a publication summarizes official proceedings or public records. Pennsylvania has long recognized a privilege for the press to report on

10

official proceedings and reports, even when those proceedings contain defamatory allegations. *Sciandra v. Lynett*, 187 A.2d 586, 588–89 (Pa. 1963); *First Lehigh Bank v. Cowen*, 700 A.2d 498, 503 (Pa. Super. Ct. 1997). The privilege exists because the public has an interest in knowing what occurs in public affairs. *Sciandra*, 187 A.2d at 588. A report need not be perfect; substantial accuracy is enough. *Binder v. Triangle Publications, Inc.*, 275 A.2d 53, 56–57 (Pa. 1971); *First Lehigh Bank*, 700 A.2d at 502. The privilege does not protect a publisher who materially departs from the official record or uses the record as a springboard for a defamatory statement that the record does not fairly support.

These principles define a narrow path through Count I. The First Amendment protects the Inquirer's right to report aggressively on Kensington, real estate speculation, crime, public safety, code enforcement, and redevelopment. Pennsylvania law also requires this Court to read the Article as a whole and to ask whether any specific statement or implication is factual, defamatory, of and concerning Plaintiffs, materially false, and unprivileged. That framework narrows the case substantially. Rhetorical labels, policy judgments, disclosed-fact commentary, and substantially true summaries do not proceed. Only concrete factual statements or fair implications that plausibly alter the Article's gist may survive Rule 12(b)(6), and even those theories will face summary judgment scrutiny after focused discovery.

## IV.    DISCUSSION

### A. The Article Addressed Matters of Public Concern, but That Does Not End the Defamation Analysis.

The Article sits on First Amendment ground that courts must tread carefully. It addresses Kensington's drug crisis, vacant properties, blight, code enforcement, City action, public safety, and redevelopment. Those subjects are not private quarrels dressed up as news. They are matters of public concern: issues "relating to any matter of political, social, or other concern to the community." *Snyder*

11

*v. Phelps*, 562 U.S. 443, 453 (2011). Speech on such subjects receives constitutional breathing room because public debate must remain "uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

That context does not decide the motion, but it shapes every part of it. The Constitution does not make newspapers liable merely for choosing a sharp thesis, a skeptical frame, or a loaded vocabulary. Labels such as "speculator," claims that absentee ownership contributed to neighborhood decline, and predictions that investors may profit from redevelopment are political and moral judgments drawn from disclosed facts. A reasonable reader would not understand "speculator" as a laboratory measurement. It is a charged description of an investment strategy. The First Amendment leaves room for that kind of charge, especially where the Article discloses the factual basis for the reader to accept or reject it. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–21 (1990); *McCafferty v. Newsweek Media Group, Ltd.*, 955 F.3d 352, 357–60 (3d Cir. 2020); *Pacira BioSciences, Inc. v. American Society of Anesthesiologists, Inc.*, 63 F.4th 240, 250–56 (3d Cir. 2023).

The same constitutional protection has limits. Public-concern reporting is protected, not untouchable. A newspaper may argue, criticize, synthesize, and accuse; it may not avoid scrutiny for materially false factual assertions simply by publishing them in an article about an important public problem. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–77 (1986). A statement that a man "shot and killed" someone before fleeing into a plaintiff's property is factual. A statement that properties "racked up" hundreds of code violations is factual enough to test. An attribution that a plaintiff said it is cheaper to ignore certain violations is factual. A framing that Plaintiffs knowingly or recklessly enabled an organized drug market may also be factual if that is the implication the Article fairly conveys. See *Menkowitz v. Peerless Publications, Inc.*, 176 A.3d 968, 980–81 (Pa. Super. Ct. 2017).

The Court therefore separates protected civic argument from potentially actionable factual anchors. The former does not proceed. The latter survives only where Plaintiffs plausibly plead that the Article, read as a whole, conveyed a materially false defamatory fact or implication. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516–17 (1991). That approach respects the constitutional protection for hard-hitting journalism while limiting this case to the few concrete statements and implications that can fairly be tested for falsity.

**B. The "Real-Estate Speculator" Label and Statements About Ehrlich's Property Portfolio Do Not Support a Defamation Claim.**

Plaintiffs first challenge the Article's use of the term "real-estate speculator." That theory does not survive. The Article used the term in a story about Kensington property ownership, vacant and distressed parcels, code enforcement, drug activity, and redevelopment pressure. In that setting, "speculator" is not a verifiable accusation of crime, fraud, or professional misconduct. It is an evaluative label for a business model: buying property in a distressed neighborhood with the prospect that values may rise. A reasonable reader would understand the word as pointed and critical, not as a factual assertion capable of being proven true or false in isolation.

The Article also disclosed the facts on which that label rested. It described Ehrlich as having interests associated with more than 125 properties in Kensington and close to 800 citywide. Compl. ¶ 26, ECF No. 1. It connected that portfolio to distressed-property purchases, vacant lots, code violations, neighborhood complaints, City enforcement, and the possibility that Kensington property values could increase if the neighborhood redeveloped. *Id*. ¶¶ 26, 36, 55–64, 71–72. Readers were therefore given the factual basis for the Inquirer's characterization and could decide for themselves whether "speculator" was fair, unfair, overstated, or apt. That is disclosed-fact commentary, not actionable defamation. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–21 (1990); *McCafferty v.*

*Newsweek Media Group, Ltd.*, 955 F.3d 352, 357–60 (3d Cir. 2020); *Pacira BioSciences, Inc. v. American Society of Anesthesiologists, Inc.*, 63 F.4th 240, 250–56 (3d Cir. 2023).

The headline and online title do not change the outcome here. Plaintiffs allege that the Article's print headline stated, "How speculators fueled a nightmare for Kensington residents — and could soon cash in," and that online search results condensed the title to "Kensington real-estate speculators are fueling the drug crisis." *Id.* ¶¶ 18–19, ECF No. 1. Those ideas are sharply critical. They are also broad thesis statements about a public controversy. They do not state that Ehrlich personally sold drugs, committed a specific crime, bribed officials, falsified records, or engaged in a discrete act of professional misconduct. They express the Article's critical view that real estate investment practices contributed to neighborhood conditions and may later produce private profit. That kind of civic argument is protected, particularly where the Article supplies the facts on which the argument rests.

Plaintiffs' portfolio theory fails for similar reasons. Plaintiffs emphasize that many properties were held by LLCs rather than by Ehrlich personally, and that A Kensington Joint LLC—not Ehrlich in his individual capacity—purchased Triple X. Id. ¶¶ 28–30. That distinction may matter for title, tax, corporate governance, liability, or veil-piercing. It does not materially change the defamatory sting of the Article. Plaintiffs themselves plead that Ehrlich is a principal of Good Bet Trading LLC and A Kensington Joint LLC, and that those entities are part of his real estate activity. *Id.* ¶¶ 1–3, 16, 26–30. In context, the Article's references to Ehrlich's portfolio, Ehrlich-associated properties, or properties connected to his companies conveyed that the properties were tied to his real-estate operations. The pleaded corporate-form distinction would not have a different effect on the mind of the average reader. See *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516–17 (1991); *ToDay's Housing v. Times Shamrock Communications, Inc.*, 21 A.3d 1209, 1215 (Pa. Super. Ct. 2011).

14

This ruling does not give the Article a free pass for every statement about Ehrlich-affiliated properties. The Court addresses separately the "Goodbet's Footprint of Blight" graphic and the statement that Ehrlich's Kensington properties "racked up some 500 code violations since 2014." Those challenged statements are more concrete because they may imply ownership, control, timing, and responsibility for particular violations. The general "speculator" and portfolio theories are different. They challenge the Article's vocabulary and frame, not a materially false factual assertion. Those theories are therefore dismissed.

### C. The Statement That "Ehrlich Bought Triple X" is Not Materially False and Will Therefore be Dismissed.

The article's statement that Ehrlich bought Triple X is also not materially defamatory. Plaintiffs allege that A Kensington Joint bought the property and that Ehrlich holds a member interest in that entity. *Id*. ¶¶ 29-30. The difference between "Ehrlich bought" and "an Ehrlich-affiliated LLC bought" does not alter the reputational sting. The Article's point was that Triple X became part of Ehrlich's real estate operation. Plaintiffs' own pleading confirms the relevant association: Ehrlich is alleged to be a principal of A Kensington Joint LLC, and A Kensington Joint LLC is alleged to have purchased Triple X. *Id*. ¶¶ 1–3, 28–30, ECF No. 1.

### D. The Adult-Bookstore and Alleged Prostitution-Front References do not Independently Support a Defamation Claim.

The Article's reference to Triple X's adult-bookstore history does not independently state a defamation claim. The Article described Triple X as "a fenced-in compound" containing vacant lots and an empty storefront that "once housed an adult bookstore and alleged prostitution front," with a fading "XXX" sign above the door. *Id*. ¶ 28. That description helps set the Article's atmosphere. It presents Triple X as a property with a seedy past, and Plaintiffs may rely on that language as part of their broader argument that the Article surrounded Ehrlich and his entities with criminalized imagery.

15

The statement, however, cannot fairly be read to accuse Plaintiffs of prostitution-related misconduct. Its key words are limiting words. "Once housed" situates the adult bookstore and alleged prostitution front in the property's past. "Alleged" signals qualification rather than adoption of the accusation as established fact. The Article does not say that Ehrlich, Good Bet, or A Kensington Joint operated a prostitution front, knew about prostitution, profited from prostitution, permitted prostitution, or acquired Triple X for any illicit purpose. Nor does it state that prostitution occurred during Plaintiffs' ownership. Read in context, the passage describes the property's history and visual condition; it does not charge Plaintiffs with participating in that history. The Court therefore will not convert a historical description of Triple X into a present-tense accusation against Plaintiffs.

### E.  The "Ground Zero" and "Organized Drug Market at Triple X" Language Survives in a Narrowed Form.

The "ground zero" and organized-drug-market allegations present a materially closer question. The article does not merely report that Triple X was located in a high-crime area or that drug activity frequently occurred nearby. It identifies Triple X itself as "ground zero," describes dealers erecting narcotics tables and tents in its immediate vicinity, and characterizes the area as "the organized drug market at Triple X." *Id*. ¶¶ 37–45. Read together, those allegations convey that Triple X was the focal point and operating base of a structured narcotics market. They also carry the implication that Plaintiffs, through their ownership, management, or tolerated property conditions, permitted Triple X to become the physical center of that market. That is a far more pointed accusation than generalized neglect or proximity to neighborhood crime.

The Inquirer Defendants have serious defenses. The article disclosed facts supporting its thesis. It also reported that Ehrlich went to police, feared confronting armed dealers, and tried to set boundaries against drug activity. Those statements cut against any suggestion that Ehrlich personally

16

dealt drugs or affirmatively approved narcotics sales. The article is not reasonably read to accuse him of being a drug dealer.

The only viable implication is narrower. Plaintiffs may proceed on the theory that the article falsely implied that they knowingly or recklessly enabled Triple X to become an organized drug-market hub. That theory is concrete enough to survive Rule 12(b)(6), though only barely. Discovery on this theory must stay tied to that factual implication. Plaintiffs may not use it to reopen every policy judgment or rhetorical flourish in the article.

**F. The August 2022 Shooting Narrative Survives Only as to the Alleged False "Shot And Killed" Statement.**

The August 2022 narrative is among the most concrete challenged statements. The article states that a man "shot and killed" a person inside a nearby corner store and then fled into the former adult-bookstore storefront. *Id.* ¶ 46, ECF No. 1. It also uses that account to explain why shutting down Triple X became a City priority.  *Id.* ¶ 52. Plaintiffs allege that this was false: no murder occurred, and no public record supports the article's account of a killing. *Id.* ¶¶ 47–51.

The Court rejects Plaintiffs' broader theory that this passage accused Ehrlich of intentionally harboring a murderer. Defamation by implication does not permit a plaintiff to supply an accusation that the publication itself does not reasonably convey. *See Menkowitz*, 176 A.3d at 982. A report that a suspect fled into a building does not naturally suggest that the owner invited him inside, concealed him, protected him from law enforcement, or knowingly provided safe harbor. That inference depends on additional facts and assumptions not fairly contained in the challenged statement. Plaintiffs therefore may not proceed on a theory that the article accused Ehrlich of harboring or assisting a murderer.

17

However, the "shot and killed" statement itself is different. At the pleading stage, the Court must consider the article's words in context and ask how they would tend to affect the ordinary reader's understanding of Plaintiffs and the property. *See Tucker*, 848 A.2d at 123-124; *Graboff*, 744 F.3d at 136. "A shooting suspect fled into Triple X" and "a man shot and killed someone and fled into Triple X" do not necessarily carry the same gist or sting. The latter ties Triple X to a homicide, not merely to police activity or neighborhood disorder. It also strengthens the article's causal narrative that conditions at or around Triple X had escalated from nuisance activity to deadly violence, thereby justifying urgent City action. If the murder component is false, that difference is not a minor inaccuracy; it could materially alter the defamatory force of the passage. *See Masson*, 501 U.S. at 517. Plaintiffs may therefore proceed on the narrower theory that the article falsely connected Triple X to a murder and used that asserted murder to support its escalation narrative.

### G. The Code Violation and Good Bet Graphic Allegations Survive Only as to Alleged Attribution of Pre-Acquisition Violations.

The Complaint plausibly challenges the statement that Ehrlich's Kensington properties had "racked up some 500 code violations since 2014" and the graphic titled "Goodbet's Footprint of Blight." Compl. ¶¶ 55-64. Plaintiffs allege that many violations predated their or affiliated entities' ownership, and that Good Bet primarily markets properties rather than directly owning the properties depicted. *Id*.

The Inquirer Defendants may ultimately show that public records make the statement and graphic substantially true. They may also show that the article accurately tied the violations to Ehrlich-associated properties. That record may narrow or end this theory at summary judgment. At the pleadings stage, however, "racked up" can imply responsibility for accruing violations, not merely later association with properties carrying old violations. "Goodbet's Footprint of Blight" can imply ownership or operational responsibility, not merely marketing. If many listed violations were

18

inherited or pre-acquisition, and if Good Bet did not own the properties attributed to it, the graphic and wording could materially mislead readers about responsibility. That narrow theory survives.

### H. The Article's Statements About Possible Future Redevelopment Profits And Drug-Dealer Comparison are Nonactionable Opinion and Rhetorical Criticism.

The Article stated that cleaning up Kensington could "pave the way for surging development and soaring property values," leaving "the same speculators who enabled the disorder and disrepair poised to cash in." It also quoted a resident who said she saw little difference between drug dealers and the property owner because both were "cashing in on other people's misery." Those statements express a severe moral criticism of Ehrlich's real-estate investment practices and of the possibility that property owners could benefit from future redevelopment profits after years of neighborhood distress.

The challenged "cash in" language is not actionable unless it reasonably conveys a provably false factual assertion. In context, these statements and language are rhetorical, predictive, and evaluative. It expresses the Article's view that property owners who held Kensington real estate during years of drug activity, blight, and public suffering may later profit if redevelopment increases property values. A reasonable reader would understand that point as moral and civic condemnation, not as a factual assertion that Ehrlich sold drugs, shared in drug proceeds, or had already realized a specific illicit profit.

The resident's comparison to drug dealers is protected for the same reason. The First Amendment protects caustic commentary, moral judgment, and even unfair rhetorical attacks on matters of public concern. Courts do not sit as tone police for investigative journalism. A resident's assertion that a property owner is morally comparable to drug dealers may be excessive, offensive, or unfair. It is not a verifiable factual statement about Ehrlich's conduct. The theories based on the "cash in" language and the drug-dealer comparison are therefore dismissed.

19

I.    **The "Cheaper to Ignore Violations" Statement/Attribution Survives as a Disputed Factual Assertion.**

Plaintiffs also challenge the article's attribution to Ehrlich of the statement: "It's cheaper to ignore violations for trash or weeds." Compl. ¶¶ 65-67, ECF No. 1. Whether Ehrlich said that, whether the article fairly paraphrased him, and whether context changed its meaning are factual questions. This attribution is different from the Article's broader moral criticism of real-estate speculation or its discussion of possible future redevelopment profits. It presents a concrete position as Ehrlich's own: that paying fines for trash or weed violations was cheaper than correcting the violations. Context is important here. The statement supports the article's broader suggestion that Ehrlich treated code compliance as a business cost and chose not to remediate neighborhood conditions. That could carry defamatory force in a story about blight and public safety. The Court will not dismiss this theory before discovery.

J.    **The Overall False-Gist Theory Survives Only as Tied to Four Specific Factual Assertions.**

Pennsylvania law recognizes that a defamatory statement may be false not only because its individual words are literally untrue, but also because the publication, read as a whole, conveys a materially false implication. *See Dunlap v. Phila. Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. Ct. 1982); *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014). Thus, literal accuracy does not always defeat a defamation claim if the publication's overall gist or sting falsely conveys a defamatory meaning. *See Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516–17 (1991). The question is whether the challenged publication, viewed in context, would have a different effect on the mind of the ordinary reader than the truth would have produced. *Id*. at 517.

20

The false-gist doctrine is subject to limits. A plaintiff may not create a defamation claim by assigning the publication a strained or unnatural meaning. The asserted implication must be "fairly and reasonably" supported by the challenged language. *Sarkees v. Warner-West Corp.*, 37 A.2d 544, 546 (Pa. 1944). Innuendo may explain the defamatory meaning a plaintiff attributes to the words, but it may not introduce new matter, enlarge the natural meaning of the language, or give the publication a construction it will not bear. *Id.*; *Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 217 (Pa. 1981). Nor may a plaintiff rely on an "unfair and forced construction" of the publication. *Bogash v. Elkins*, 76 A.2d 677, 679 (Pa. 1962).

The Court therefore must perform a threshold screening function. It must consider the entire article, the challenged language, and the impression the publication would naturally create in the mind of the average reader. *See Green v. Mizner*, 692 A.2d 169, 172 (Pa. Super. Ct. 1997); *Tucker v. Phila. Daily News*, 848 A.2d 113, 123–24 (Pa. 2004). If the publication is not reasonably capable of the defamatory meaning Plaintiffs assign to it, the theory fails as a matter of law. If, however, the language is reasonably capable of both an innocent and a defamatory meaning, the question whether readers understood the defamatory meaning is ordinarily for the factfinder. *See Pelagatti v. Cohen*, 536 A.2d 1337, 1345 (Pa. Super. Ct. 1987).

Since the Article addressed matters of public concern, Plaintiffs also must plead and ultimately prove material falsity. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–77 (1986). It is not enough to show that the Article was harsh, unfair, selectively framed, or morally condemnatory. Nor is it enough to identify rhetoric, opinion, or criticism based on disclosed facts. The false-gist theory survives only if the Article's words, images, and structure are reasonably capable of conveying a specific, provably false factual implication that materially changes the gist or sting of what was reported. Applied here, Plaintiffs' false-gist theory cannot proceed as a broad challenge to the Article's tone, editorial framing, or criticism of real-estate speculation in Kensington. The Article's

21

cumulative force, headline, photographs, graphics, sequencing, and omissions may be considered only to assess whether the publication fairly conveys a materially false factual implication. They cannot convert protected opinions into facts, make a defamation case out of one-sidedness alone, or turn a newspaper's public-policy thesis into a jury issue simply by calling it damaging.

A narrowed false-gist theory may proceed only to the extent it is tied to four concrete factual assertions or implications that allegedly gave the Article its defamatory sting. The first is that the Article portrayed Triple X as the focal point and operating base of an organized drug market by describing it as "ground zero" and referring to drug activity as occurring "at Triple X." The second is that the Article connected Triple X to a homicide by stating that a man "shot and killed" a person inside a nearby corner store before fleeing into the former adult-bookstore storefront. The third is that the Article materially overstated Plaintiffs' responsibility for code violations by attributing violations to Ehrlich-associated properties without accounting for whether those violations predated Plaintiffs' ownership or control. The fourth is that the Article attributed to Ehrlich the view that "[i]t's cheaper to ignore violations for trash or weeds." Unlike the Article's broader criticism of real-estate speculation, property ownership, and possible future redevelopment profits, those assertions are concrete enough to be tested for falsity and for their material effect on the ordinary reader.

Read as a whole, and only through those anchors, the Article plausibly could convey that Plaintiffs did more than own distressed properties in a neighborhood already suffering from drugs and blight. It could plausibly imply that Plaintiffs knowingly or recklessly enabled criminal disorder and blight at Triple X and then positioned themselves to profit from it. That limited implication survives; the broader theory does not.

This ruling substantially narrows the case. Plaintiffs may not pursue discovery or trial theories based on the Article's use of the term "real-estate speculator," its general statements about the number of properties associated with Ehrlich or his entities, its statement that Ehrlich bought Triple X rather

22

than that A Kensington Joint LLC purchased it, its reference to Triple X's prior use as an adult bookstore and alleged prostitution front, or its criticism that property owners may benefit from future redevelopment profits after years of neighborhood distress. Count I survives only to the extent it rests on the four specific factual theories identified above and any false gist that fairly arises from those theories.

### K.  Public Records, Collateral Estoppel, and Summary Judgment

The public record materials narrow the issues, but they do not resolve the surviving claims at the pleading stage. The Inquirer Defendants rely on demolition proceedings and other public materials concerning Triple X. Those materials may be considered for certain limited purposes: to show what proceedings occurred, what City officials or courts said, what relief was sought or granted, and whether particular findings were made. They may also bear on substantial truth, fair-report privilege, opinion based on disclosed facts, and issue preclusion. However, the existence of public records concerning dangerous or nuisance conditions at Triple X does not, by itself, establish that every challenged statement or implication in the article was true, nondefamatory, privileged, or precluded.

That distinction is especially important here because the surviving theories are narrower than the article's general account of Triple X. Plaintiffs may not relitigate matters that were actually and necessarily decided in prior proceedings. The remaining claims, however, do not turn only on whether Triple X was dangerous, whether nuisance conditions existed, or whether the City had grounds to pursue demolition. They turn on more specific asserted meanings: for example, whether the article falsely connected Triple X to a murder, or falsely implied that Plaintiffs knowingly or recklessly enabled the property to become the hub of an organized drug market. Public records showing serious problems at the property may strongly support the Article's general reporting, but they do not necessarily resolve those more specific questions of falsity, defamatory meaning, fault, or sting.

23

Collateral estoppel also cannot be applied wholesale on the present record. Under Pennsylvania law, issue preclusion applies only when the identical issue was actually decided in a prior adjudication, the decision was final and on the merits, the party against whom preclusion is asserted was a party or in privity with a party, and that party had a full and fair opportunity to litigate the issue. *Shaffer v. Smith*, 673 A.2d 872, 874 (Pa. 1996). Federal courts give Pennsylvania judgments the preclusive effect Pennsylvania courts would give them. *In re Brown*, 951 F.2d 564, 568–69 (3d Cir. 1991). The doctrine is issue-specific; it precludes only determinations that were actually litigated and essential to the prior judgment. *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249–50 (3d Cir. 2006).

Thus, if a prior state court proceeding necessarily determined that Triple X was unsafe, constituted a nuisance, was associated with drug activity, or that Ehrlich or A Kensington Joint bore responsibility for particular property conditions, Plaintiffs may not relitigate those determinations here simply by labeling them defamation. *See Rue v. K-Mart Corp.*, 713 A.2d 82, 84–85 (Pa. 1998). However, the current record does not permit the Court to take the further step of dismissing all surviving theories on preclusion grounds. The Court cannot yet determine, with the required precision, which issues were actually adjudicated, whether those determinations were essential to a final judgment, whether they are identical to the defamatory meanings still at issue, and whether they resolve the materially different gist or sting Plaintiffs challenge in this case.

The same limitation applies to the public records more generally. At Rule 12(b)(6), the Court may consider appropriate public records without converting the motion into one for summary judgment, but it may not use disputed inferences from those records to resolve contested factual questions against Plaintiffs. The records may show that Triple X was the subject of public enforcement activity and that officials described serious conditions at or near the property. They do

not necessarily establish, as a matter of law on the pleadings, that the article's specific surviving implications were true or that any alleged falsity was immaterial.

The practical consequence is narrow but important. Survival under Rule 12(b)(6) is not a merits ruling. Plaintiffs still must prove falsity, defamatory meaning, fault, and damages. The Inquirer Defendants remain free to renew their substantial-truth, disclosed-fact opinion, public-record, privilege, and issue-preclusion arguments on a developed record. Discovery, however, must remain targeted to the specific surviving statements and implications. It may not become a broad inquiry into every characterization in the article, every editorial judgment made by the newsroom, or the larger public-policy dispute over Kensington, redevelopment, and nuisance enforcement.

### L. PA-UPEPA

The Inquirer Defendants also invoke Pennsylvania's Uniform Public Expression Protection Act, 42 Pa. Cons. Stat. §§ 8340.11 et seq. The Article qualifies at the threshold as protected public expression. It is journalistic reporting on matters of public concern. Nothing about this ruling suggests otherwise. However, the Court need not make PA-UPEPA the engine of the decision. The motion is resolved under Rule 12(b)(6) and ordinary defamation principles. State anti-SLAPP procedures can raise federal procedural questions when they alter pleading burdens, discovery, or dismissal mechanisms. This case does not require the Court to decide those questions now.

Since Count I survives in limited part, the Inquirer Defendants have not established complete entitlement to immunity or fees at this stage. Their PA-UPEPA request is denied without prejudice. They may renew appropriate immunity or fee arguments if the surviving portions of Count I are later dismissed or resolved in their favor.

25

## V.    CONCLUSION

The Inquirer Defendants' motion to dismiss Count I is granted in part and denied in part. It is granted as to defamation theories based on the "real-estate speculator" label; general property-count and portfolio statements; the shorthand that "Ehrlich bought" Triple X; the historical adult-bookstore and alleged prostitution-front reference; and the "cash in," profiteering, and drug-dealer-equivalence commentary.

The motion is denied only as to four narrow theories: (1) whether the Article falsely implied that Plaintiffs knowingly or recklessly enabled an organized drug market at Triple X; (2) whether the Article materially misstated the August 2022 incident by reporting that a man "shot and killed" someone before fleeing into Triple X; (3) whether the "500 code violations" statement and "Good Bet's Footprint of Blight" graphic materially misattributed inherited or pre-acquisition violations and Good Bet ownership or responsibility to Plaintiffs; and (4) whether the Article falsely attributed to Ehrlich the statement that it was cheaper to ignore violations for trash or weeds.

The case now proceeds on a much narrower track. The First Amendment bars Plaintiffs from pursuing defamation claims based on the article's civic judgments, rhetorical force, and disclosed-fact policy commentary. The surviving claims are limited to factual propositions that can be tested.

BY THE COURT:

_____

Hon. Mia R. Perez

26